696 So.2d 551 (1997)
Aaron BANKS, Jr.
v.
INDUSTRIAL ROOFING & SHEET METAL WORKS, INC.
No. 96-C-2840.
Supreme Court of Louisiana.
July 1, 1997.
*553 William Travis Allison, Mills, Timmons & Flowers, Shreveport, for Applicant.
Donald J. Anzelmo, Crawford & Anzelmo, Monroe, for Respondent.
CALOGERO, Chief Justice.
In this workers' compensation case, the hearing officer, after a trial on the merits, awarded the claimant maximum supplemental earnings benefits and ordered vocational rehabilitation, finding that the employer failed to establish that there were reasonably available jobs in claimant's geographical region and within claimant's physical limitations that paid ninety percent (90%) or more of claimant's average pre-injury wage. The court of appeal reversed, finding that the employer sufficiently demonstrated the availability of several jobs within claimant's physical capabilities and geographic region, which paid more than claimant's average pre-injury wage. We granted certiorari to determine whether the court of appeal erred in concluding that the hearing officer's findings were manifestly erroneous. We also granted the writ to resolve a split among the courts of appeal as to what an employer must do to carry its burden of proving job availability. For the reasons that follow in this admittedly close case, we reverse the court of appeal, amend the hearing officer's judgment, and affirm as amended.

FACTS & PROCEDURAL HISTORY
On September 8, 1993, Aaron Banks, Jr. (Banks), an employee of Industrial Roofing & Sheet Metal Works (Industrial), sustained an injury to his right thumb in the course and scope of his employment as a roofer's helper. Banks had been employed full-time by Industrial as a roofer's helper for three and one-half years prior to the accident, where he had earned $5.50 an hour and an average weekly wage of $220.69. From the date of the accident through January 24, 1995, Industrial paid Banks compensation benefits in the amount of $147.13 per week.
The September 8, 1993 injury occurred when a bundle of shingles fell off the roof of Don's Seafood and hit Banks' right hand, thereby dislocating and fracturing his thumb. After informing his supervisor, James Robertson, of the injury, Banks reported to the emergency room of Willis-Knighton Medical Center where he was examined *554 by Dr. James Lillich. After determining that Banks sustained a comminuted right fracture dislocation of the thumb, Dr. Lillich admitted Banks and performed a surgical procedure on him the following day (specifically, an open reduction and internal fixation and a repair of ligament structures). Banks remained under Dr. Lillich's care for several months following the surgery.
On December 22, 1993, Dr. Lillich opined that Banks had "most likely reached maximum medical improvement" and that he might be able to return to work on January 3, 1994. However, when Banks complained of continuing stiffness and pain in his hand on January 12, 1994, Dr. Lillich referred Banks to Dr. Marion Milstead, a specialist in hand surgery, and recommended that he not return to work until authorized to do so by Dr. Milstead.
Banks was first examined by Dr. Milstead on January 17, 1994. Dr. Milstead eventually concluded that Banks' continued pain and suffering were caused by traumatic arthritis and that Banks' pain might be lessened by a fusion of the MP joint. Banks decided against undergoing the fusion procedure because the fusion would result in further loss of motion of his thumb. On March 15, 1994, Dr. Milstead informed Banks that he would never be able to return to roofing-type work because of the degenerative changes in the joint and recommended that Banks seek vocational rehabilitation for a different type of work.
At Industrial's request, Banks was also examined by Dr. Gordon M. Mead on March 25, 1994. Dr. Mead concurred with Dr. Milstead that Banks was suffering from post-traumatic arthritis in the right thumb and also agreed with Dr. Milstead's recommendation of an MP joint fusion. Dr. Mead further opined that, even if Banks had the fusion, he would not be able to return to heavy manual labor.
In mid-1994, Industrial engaged a vocational rehabilitation firm, Glenn-Mar, to render rehabilitation services to Banks. Glenn-Mar assigned Janet Papworth, a certified vocational rehabilitation counselor, to work with Banks. Papworth first met with Banks and his wife on July 19, 1994. At that meeting, Papworth completed an "initial vocational evaluation" of Banks, wherein she identified Banks' work experience, interests, and other factors necessary to assess his ability to return to work. Papworth then performed a transferrable skills analysis based upon Banks' objective work history, education, and current medical status for the purpose of determining what type of post-injury work might be suitable for Banks. Papworth learned that Banks was a 44-year-old high school graduate who had previously been employed as an orderly, a cook, and a baker's helper prior to his employment with Industrial as a roofer's helper.
On August 8, 1994, Papworth met with Dr. Milstead, Banks, and his wife. At that meeting, Dr. Milstead told Papworth that although Banks still suffered from a limited range of motion in his right thumb and decreased pinch and grip strength, he had reached maximum medical improvement (barring any further surgical intervention to decrease pain). On September 7, 1994, Dr. Milstead formally released Banks to return to work, subject to the following permanent restrictions: no strenuous gripping or pinching and no lifting over fifteen (15) pounds.
On October 4, 1994, Papworth again met with Banks and his wife to provide Banks with job seeking skills and to start the vocational counseling process. At that meeting, Papworth suggested that Banks register with the local Job Service office and fill out an application with the Job Training Partnership Act to be considered for their job training program. Papworth advised Banks to be persistent, to apply for jobs in person, to keep a daily job search work sheet, and to dedicate between twenty to twenty-five hours a week to job searching activities. Papworth also informed Banks that she would begin searching for available jobs within the work restrictions set forth by Dr. Milstead (no strenuous gripping or pinching and no lifting over fifteen (15) pounds). To that end, Papworth completed a job labor market survey.
In a letter dated October 26, 1994, Dr. Milstead assigned Banks a 23% upper extremity disability rating (20% impairment for loss of grip strength, 1% impairment for *555 crepitation in the joint from the traumatic arthritis, and 2% for loss of motion of the PIP joint of the thumb) and a 14% total body loss disability rating.
On December 1, 1994, Papworth met with Dr. Milstead, Banks, and his wife to review job analyses for five potential jobs that Papworth had identified for Banks.[1] The five jobs identified in the labor market survey, which were allegedly within Banks' physical restrictions and geographical region, were as follows: (1) tractor-trailer driver, (2) unarmed security guard, (3) pest control trainee, (4) cab driver, and (5) dispatcher. Based solely upon the limited information provided by Papworth as to the particular requirements of each job, Dr. Milstead approved all of the jobs, finding them to be within Banks' physical capabilities. The wages for these jobs ranged from $4.25 per hour up to an estimated $500 per week. According to the labor market survey, there was one job opening for each of the above-listed jobs on November 21, 1994. There is nothing in the record, however, that indicates that any or all of these jobs were still available on December 1, 1994, the date that Banks first learned of their existence, or thereafter.
At the close of the December 1, 1994 meeting, Papworth provided Banks with a written list of these jobs, along with the names and addresses or phone numbers of the potential employers. Papworth also mailed a copy of the job list to Banks' counsel on January 1, 1995. This copy was forwarded by his counsel to Banks on January 10, 1995. On January 25, 1995, without any further communication or any other follow-up whatsoever with Banks or his counsel, Industrial terminated Banks' benefits.
On February 2, 1995, Banks initiated this suit by filing a disputed claim for compensation form with the Office of Workers' Compensation Administration, alleging claims for "meaningful" rehabilitation and wrongful termination of benefits. On February 9, 1995, Papworth attempted to schedule a meeting with Banks, but, on the advice of his counsel, Banks refused further rehabilitation services, pending the outcome of this litigation.
After a trial on the merits on September 15, 1995, the workers' compensation hearing officer awarded Banks supplemental earnings benefits in the amount of $147.13 per week, retroactive to January 25, 1995, the date that Industrial terminated compensation benefits, reasoning that Industrial failed to establish that the identified jobs were "realistically available ..., while at the same time being within Banks' physical abilities."[2] The hearing officer also ruled that Banks was entitled to further rehabilitation services in accordance with LSA-RS 23:1226, but denied Banks' claims for attorney fees and penalties.
Industrial appealed, arguing that it had met its burden of establishing the availability of several jobs within Banks' physical capabilities and geographic region that paid more than his pre-injury wage. Banks answered the appeal, arguing that the hearing officer erred in failing to award attorney fees and penalties. The court of appeal agreed with Industrial and reversed the judgment of the hearing officer, finding the hearing officer's conclusions to be manifestly erroneous. Nonetheless, "in the spirit of liberal construction and application, [the court of appeal] ... extend[ed] Banks' benefits until February 9, 1995, the date on which he refused further vocational rehabilitation services." Banks, 28,731 at p. 5, 682 So.2d at 847.

DISCUSSION
The matter before us presents a close case. Even the hearing officer, who ruled in favor of the claimant, acknowledged that this is not a case of "sham" rehabilitation. Nonetheless, the hearing officer ultimately concluded that the employer failed to satisfy its burden of proof on the issues of supplemental earnings benefits and vocational rehabilitation. As noted above, the court of appeal disagreed *556 and reversed on factual, rather than legal, grounds.

Standard of Review
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; Freeman v. Poulan/Weed Eater, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Freeman, 93-1530 at p. 5, 630 So.2d at 737-38; Stobart v. State, 617 So.2d 880, 882 (La. 1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
In the instant case, for the reasons that follow, we conclude that the hearing officer was presented with two permissible views concerning the issues of job availability and claimant's earning capacity. Therefore, the hearing officer's factual findings were neither manifestly erroneous nor clearly wrong.

Supplemental Earnings Benefits
"The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993). An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. LA.REV.STAT. ANN. § 23:1221(3)(a) (West Supp.1997). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Freeman, 93-1530 at p. 7, 630 So.2d at 739. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989).
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. LA.REV.STAT.ANN. § 23:1221(3)(c)(i) (West Supp.1997); Daigle, 545 So.2d at 1009. Actual job placement is not required. Romero v. Grey Wolf Drilling Co., 594 So.2d 1008, 1014-15 (La.App. 3d Cir.1992). The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. LA.REV.STAT.ANN. § 23:1221(3)(a) (West Supp.1997).
It is undisputed, in the instant case, that Banks is unable to return to his pre-injury employment as a roofer's helper. It is also undisputed that Banks has been assigned a 23% upper extremity disability rating and a 14% total body disability rating. The hearing officer found that Banks had carried his burden of proving a prima facie case of entitlement to SEBs. Industrial did not contest that determination in the court of appeal and does not now contest that determination in this Court. Thus, the only question properly before this court, with respect to the SEB issue, is whether Industrial carried its burden of proving that there are jobs available to Banks within his physical capabilities and geographic region that would enable him to earn ninety percent (90%) or more of his pre-injury wage.
Although all agree that actual job placement is not necessary, the courts of appeal *557 have applied various and, at times, inconsistent standards in determining whether an employer has satisfied its burden of proving "job availability" under LSA-RS 23:1221(3)(c)(i). For example, in the Fourth Circuit, an employer may carry its burden by showing that "generally jobs are available within the range of plaintiff's capacity," with a labor market survey being unnecessary to meet this burden. Batiste v. Hopeman Bros., 508 So.2d 922, 923 (La.App. 4th Cir. 1987). However, in the First Circuit, an employer must demonstrate that the employee is "physically able to perform a particular job and that the job was either offered ... or was available [to the employee] in ... the reasonable geographic region." Putman v. Commerical Union Ins. Co., 93-2263, p. 10 (La.App. 1st Cir. 11/10/94), 645 So.2d 1250, 1255. Similarly, in the Fifth Circuit, an employer must prove that the "available jobs" are "realistically obtainable by the employee and ... offer earnings which are more than mere speculation." Culotta v. Great Atlantic & Pacific Tea Co., 524 So.2d 259, 262 (La. App. 5th Cir.1988). Yet, in the Second Circuit, an employer need only show "general [employment] availability within the claimant's community or reasonable geographic area and physical capabilities." Brown v. Pioneer Log Homes, 28,488, p. 4 (La.App.2d Cir. 6/26/96), 679 So.2d 154, 157.
To resolve this uncertainty among the courts of appeal, we conclude that an employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence:
(1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
By "suitable job," we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.[3]
Applying this "minimum" standard to the instant case, we conclude that the hearing officer was not manifestly erroneous or clearly wrong in finding that Industrial failed to present sufficient competent evidence to carry its burden. As noted above, Papworth, the vocational rehabilitation counselor hired by Industrial, identified five potential jobs for Banks: (1) tractor-trailer driver, (2) unarmed security guard, (3) pest control trainee, (4) cab driver, and (5) dispatcher.[4] At the outset, we note that although *558 Papworth established that one position was available for each of these identified jobs on November 21, 1994, the record is devoid of any evidence to establish that any of these positions were still available on December 1, 1994the date that Papworth first notified Banks of their existence.[5] In addition, Banks presented testimonial evidence at trial that at least one of the identified jobs was not within his physical capabilities, as the cab driver position required an ability to lift up to fifty (50) pounds. (Banks' treating physician stated that he could not lift more than fifteen (15) pounds.) As to the remaining jobs, the hearing officer concluded that there was insufficient evidence in the record with regard to the job qualifications and physical requirements to determine whether the jobs fell within Banks' physical capabilities. There are additional shortcomings in the employer's evidence with regard to the wages that these identified jobs would pay. For example, Papworth estimated that Banks could earn $500 per week as a tractor-trailer driver, but there is no evidence from the potential employer or elsewhere to indicate that this estimate is accurate for an employee with no prior experience or training. To the contrary, it appears from the record that the wages given by Papworth for the tractor-trailer driver job and also for the cab driver job were based on nothing more than speculation.
The hearing officer concluded,
Given the lack of follow-up after the correspondence identifying the possible positions, the lack of details with regard to the job qualifications, physical requirements, and wages, and the lack of evidence substantiating Mr. Banks' opportunity to apply for a specific opening, the Court finds that Mr. Banks is entitled to additional Supplemental Earnings Benefits after January 24, 1995 and continuing until such time as modification is appropriate pursuant to LSA-RS 23:1310.8.
Banks, 95-00823 at p. 6.
In light of the evidence presented in the record, we cannot say that the hearing officer's findings were manifestly erroneous or clearly wrong. Moreover, because the record supports the hearing officer's finding that Industrial failed to establish the availability of any job, the hearing officer was correct in awarding maximum SEBs. Of course, nothing prevents Industrial from seeking the reduction or termination of these benefits if it is subsequently able to identify the existence of one or more jobs within claimant's physical capabilities and within the claimant's or employer's community or reasonable geographic region, the amount of *559 wages that an employee with claimant's experience and training can expect to earn in that job, and an actual position available for that particular job at the time that the claimant received notification of the job's existence.

Vocational Rehabilitation Services
An employee is entitled to vocational rehabilitation services if he suffers an injury that precludes his earning wages equal or in excess of his pre-injury wage. LA.REV.STAT. ANN. § 23:1226(A) (West Supp.1997). The stated goal of rehabilitation is "to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs." Id. § 1226(B)(1). In furtherance of this goal, LSA-RS 23:1226(B)(1) lists a hierarchy of seven rehabilitation options and mandates that the first appropriate option shall be chosen:
(a) Return to same position.
(b) Return to a modified position.
(c) Return to a related occupation suited to the claimant's education and marketable skills.
(d) On-the-job training.
(e) Short-term retraining program (less than twenty-six weeks).
(f) Long-term retraining program (more than twenty-six weeks but not more than one year).
(g) Self-employment.
Id. § 1226(B)(1)(a)-(g). The statute also provides that the employer is responsible for selecting an approved vocational counselor to evaluate and assist the employee in his job placement or vocational training. Id. § 1226(B)(3), (C)(2). An employee's refusal to accept rehabilitation as deemed necessary by the hearing officer results in a fifty percent (50%) reduction in benefits, including SEBs, for each week of the period of refusal. Id. § 1226(E).
As discussed in the previous section, it is uncontested that Banks carried his initial burden of proving that he is unable to earn his pre-injury wage, and Industrial failed to present sufficient evidence to carry its burden of proving otherwise. Banks, then, is entitled to receive rehabilitation services. We must thus determine the nature and extent of rehabilitation that Banks is entitled to receive.
It is uncontroverted that Banks is unable to return to his pre-injury job as a roofer's helper. Therefore, the first option, "[r]eturn to same position," is unavailable. There is also no evidence to suggest that Banks could return to a "modified" position as a roofer's helper. Thus, the second option, "[r]eturn to a modified position," also appears to be unavailable. The third option is to "[r]eturn [the claimant] to a related occupation suited to the claimant's education and marketable skills." This could be a viable option if the vocational counselor could locate a job in the related area of construction work within Banks' physical capabilities: no strenuous gripping or pinching and no lifting over fifteen (15) pounds. If not, then the fourth option, "[o]n-the-job training," appears to be an appropriate option.
It appears that Papworth, the vocational rehabilitation counselor hired by Industrial, pursued this fourth option in identifying potential jobs for Banks, as the pest control trainee, cab driver, and the tractor-trailer driver positions all required on-the-job training. If Industrial can find an available suitable job for Banks that requires on-the-job training, then Banks would not be entitled to further rehabilitation services, as the goal of rehabilitation is to return the claimant to employment as soon as possible with a minimum of retraining. We thus conclude that it would be appropriate for the vocational rehabilitation counselor to continue to pursue on-the-job training or to, perhaps, attempt to return Banks to a job in a related occupation suited to the claimant's education and marketable skills.
Next, we note that although he is entitled to receive rehabilitation services, Banks, on the ill-founded advice of his counsel, refused all rehabilitation services offered by Industrial since February 9, 1995, including the same rehabilitation services that the hearing officer and this Court has deemed necessary. This arbitrary refusal of rehabilitation services cannot inure to the benefit of the employee, who has sought, in the courts below and, now, in this Court, the very rehabilitation services that he has steadfastly refused from the employer. Consequently, *560 in accordance with the provision in LSA-RS 23:1226(E), Banks' SEBs shall be reduced retroactively by fifty percent (50%) for each week that he refused such services from February 9, 1995 until Banks agrees to accept services or until Industrial is able to establish, by a preponderance of the evidence, that Banks is able to earn ninety percent (90%) or more of his pre-injury wage, thereby entitling Industrial to terminate SEBs.

Attorney Fees & Penalties
Banks argues to this Court that the lower courts erred in failing to award him attorney fees and penalties under LSA-RS 23:1201.2[6] and LSA-RS 23:1201(E),[7] as those statutes existed on the date of the *561 injury, September 8, 1993. We disagree. Under LSA-RS 23:1201.2, a claimant is entitled to recover reasonable attorney fees if the employer or its insurer discontinues payment of compensation, when the discontinuance is found to be arbitrary, capricious, or without probable cause. 1988 La. Acts No. 732, § 1. Under former subsection (E) of LSA-RS 23:1201, a claimant is entitled to recover additional penalties from the employer for any compensation that is payable without an order, but which the employer has failed to pay. The amount of recoverable penalties is equal to twelve percent of the unpaid compensation or fifty dollars ($50.00) per calendar day for each day that the compensation remained unpaid, whichever is greater, up to a maximum aggregate amount of two thousand dollars ($2,000.00). 1992 La. Acts No. 1003, § 1. However, these penalties are not available if the employer reasonably controverts the claimant's right to such compensation. Id.
As discussed above, this is not a case of sham rehabilitation. In fact, had Industrial demonstrated at trial that the pest control trainee job, for example, was open and available on December 1, 1994 and had Industrial provided at trial an adequate job description to establish that the job was within Banks' physical capabilities, Industrial would have prevailed in this case because there was sufficient evidence in the record to establish that the job paid $5.00 per hour, which was equal to ninety percent (90%) of Banks' pre-injury wage of $5.50 per hour, and was within his reasonable geographic area. We emphasize, however, that Industrial did not establish these critical facts at trial. Thus, under the manifest error-clearly wrong standard of review, the hearing officer's findingthat Industrial, though it made an earnest effort at vocational rehabilitation, failed to carry its burden of proving job availabilitymust stand.
Nonetheless, we conclude that the termination of the Banks' benefits was not arbitrary, capricious, or without probable cause. Therefore, Banks is not entitled to recover attorney fees. We also conclude that Banks' entitlement to the benefits at issue was not unreasonably controverted by the employer. Thus, Banks is not entitled to recover statutory penalties under former LSA-RS 23:1201(E).

CONCLUSION
For the reasons given above, we reverse the judgment of the court of appeal. Further, we amend the judgment of the hearing officer to reflect that the claimant's award of maximum SEBs is to be reduced by 50% for each week that he refused or refuses to accept rehabilitation services retroactive to February 9, 1995, the date upon which Banks first refused additional rehabilitation services. We, therefore, reinstate the hearing officer's judgment as amended.

DECREE
REVERSED; HEARING OFFICER'S JUDGMENT REINSTATED AS AMENDED.
TRAYLOR, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[1] As recognized by the court of appeal, "Papworth originally located six job openings. One position, however required working in Winnfield. At trial, defendant conceded that this employment should not be considered available for this claimant." Banks v. Industrial Roofing & Sheet Metal Works, 28,731, p. 4 n. 1 (La.App.2d Cir. 10/30/96), 682 So.2d 844, 846 n. 1.
[2] Banks v. Industrial Roofing & Sheet Metal Works, 95-00823, p. 5 (District 1W 10/26/95).
[3] We are cognizant that LSA-RS 23:1221(3)(a) provides that an employee's post-injury earning capacity is to be determined by what "the employee is able to earn in any ... employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience...." Our consideration of an employee's "age, experience, and education" is not to ensure that an employee is "particularly suited" for a given post-injury job, but, rather, to ensure that the employee is capable of performing the job. For example, suppose that an employee had been engaged in heavy manual labor prior to his injury, but is now limited to light duty labor as a result of a work-related injury. Suppose also that the employee is illiterate. Under these circumstances, the mere fact that the employee would be physically able to perform secretarial duties does not mean that that job would be suitable for that employee.

We interpret the above-quoted language in LSA-RS 23:1221(3)(a) to mean only that an employee cannot discount a job, for the purpose of calculating post-injury earning capacity, that falls within the limits of his physical capabilities, age, experience, and education simply because he is not "particularly suited" for the job. For example, suppose that the hypothetical employee had a college education. He could not protest the suitability of a job that required only a high school education by asserting that the proposed job was beneath his capabilities.
[4] We note that Banks' driver's license was suspended in late February 1995 as a result of a D.W.I. This event, however, was subsequent to Papworth's identification of two jobs that would require a driver's license: a tractor-trailer driver and a cab driver. On December 1, 1994, the date upon which Papworth notified Banks about these jobs, Banks still had a valid driver's license. Though he did not have a commercial driver's license at that time, presumably, he could have acquired one. Therefore, these positions can be considered in determining whether Industrial satisfied its burden of proof. We do not reach the issue, in the case before us, of whether the employee's loss of his driver's license, through his own fault, after his work-related injury would preclude the employer from using jobs that require a driver's license in demonstrating available jobs.
[5] In oral argument and in brief, Industrial makes much of the fact that Banks delayed in applying for these jobs for several weeks after being notified of their existence. Industrial also takes issue with the manner in which Banks applied for the jobs because Banks telephoned the potential employers, rather than appearing in person to fill out applications. As recognized by the court of appeal, "[t]he effect of the employer's proof of the availability of employment within the indicated medical limitations is not enervated by a claimant's delay in making application or his half-hearted and unsuccessful efforts at obtaining employment." Banks, 28,791 at p. 5, 682 So.2d at 847.

However, an employer cannot point to a claimant's lack of effort in lieu of the employer's presenting sufficient evidence of job availability within the claimant's physical capabilities. It is the employer who bears the burden of proving job availability and the claimant's post-injury earning capacity, and the employer cannot shift this burden to the employee by pointing to his lack of effort in seeking post-injury employment. In any case, as noted above, an employer can discharge its burden by establishing the existence of a job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region, the amount of wages that an employee with claimant's experience and training can expect to earn in that job, and an actual position available for that particular job at the time that the claimant received notification of the job's existence. All of this can be proven without the cooperation or participation of the employee.
[6] At the time of Banks' injury, LSA-RS 23:1201.2 provided as follows:

Any insurer liable for claims arising under this Chapter, and any employer whose liability for claims arising under this Chapter is not covered by insurance, shall pay the amount of the claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim, or in the event a partial payment or tender has been made, to payment of all reasonable attorney's fees for the prosecution and collection of the difference between the amount paid or tendered and the amount due. Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney's fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney's fees shall not apply to cases where the employer or insurer is found liable for attorney's fees under this Section. The provisions of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.
1988 La. Acts No, 732, § 1.
LSA-RS 23:1201.2 was amended in 1995 and presently reads as follows:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provision of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.
LA.REV.STAT.ANN. § 23:1201.2 (West Supp.1997).
[7] At the time of Banks' injury, LSA-RS 23:1201(E) provided as follows:

If, pursuant to this Chapter, any compensation or medical benefits payable without an order is not paid within the time period provided in Subsections (B), (C), or (D) of this Section, there shall be added to such unpaid compensation a penalty of an amount equal to twelve percent thereof or a total penalty of not more than fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid, whichever is greater, which shall be paid at the same time as, and in addition to, such compensation, unless such nonpayment results from conditions over which the employer or insurer had no control. No amount paid as a penalty under this Subsection shall be included in any formula utilized to establish premium rates for worker's compensation insurance. Whenever the employee's right to such compensation or medical benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply. The twelve percent or fifty dollar per calendar day, whichever is greater, additional payment shall be assessed against either the employer or the insurer, depending upon who was at fault in causing the delay. No worker's compensation insurance policy shall provide that this sum shall be paid by the insurer if the administrative hearing officer determines that the twelve percent or fifty dollars per calendar day, whichever is greater, additional payment is to be made by the employer rather than the insurer. Any additional compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee. The total fifty dollar per calendar day penalty provided for in this Subsection shall not exceed two thousand dollars in the aggregate.
1992 La. Acts No. 1003, § 1.
This subsection was amended in 1995 and redesignated as subsection (F). The amended subsection reads as follows:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in tan amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the hearing officer determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsections shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
(3) Except as provided in Paragraph (4) of this Subsection, any additional compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee.
(4) In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the health care provider. This Subsection shall not be construed to provide for recovery of more than one penalty or attorney fee.
(5) No amount paid as a penalty or attorney fee under this Subsection shall be included in any formula utilized to establish premium rates for workers' compensation insurance.
LA.REV.STAT.ANN. § 23:1201(F) (West Supp.1997).