JaROBERT M. MURPHY, Judge Pro Tem.
Appellant, Sehwegmann Giant Supermarket, Inc. (Sehwegmann), appeals a judgment of the worker’s compensation court in favor of appellee, Guillermo Labarcena (Labarce-na). For the following reasons, we affirm in part, amend in part and reverse in part.
*480 FACTS AND PROCEDURAL HISTORY
Labareena[1] was injured on May 9, 1995 while in the course and scope of employment as a stock clerk with Schwegmann. Specifically, while clearing water from the store’s flooded warehouse, Labareena slipped and fell backwards onto a pallet injuring his back. As a result of the injury, Schwegmann began paying Labareena temporary total benefits in the amount of $201.95 per week.
On May 11,1995, Labareena was examined by Dr. Joseph Tamimie, band Labareena reported to Dr. Tamimie that he “felt” a “pop” in his back and some numbness in his feet when he fell at the store. Dr. Tamimie ordered x-rays which revealed a “left L5 spondylolysis and lumbar spondylosis.” Dr. Tamimie’s diagnosis was lumbosacral strain.
Following several visits with Dr. Tamimie, Labareena was seen by Dr. Cazale on May 30, 1995. In addition to conducting a physical examination, Dr. Cazale reviewed the x-rays, and it was his impression that Labarce-na’s injury was “that of a lumbar strain contusion.” Dr. Cazale recommended that a CT scan of the lumbar spine be obtained.
On June 5,1995, Labareena had a CT scan of the lumbar spine. The scan revealed evidence of degenerative changes in the facet joints; however, there was no evidence of a ruptured disc. The following day, Labareena saw Dr. Cazale who had reviewed the results of the CT scan and Dr. Cazale referred La-barcena back to Dr. Tamimie for follow-up care and his subsequent release for return to work.
At the request of Dr. Tamimie, Labareena had a MRI of the lumbar spine on June 23, 1995, and the findings were: “posterior central bulging of the L5-S1 intervertebra disc without evident nerve root effacement.” When Dr. Tamimie saw Labareena on June 28, 1995, he discharged him for regular work beginning on July 5,1995. However, on that date, Labareena returned to see Dr. Tamimie and the doctor found that Labareena was still disabled.
On July 10, 1995, Labareena consulted a chiropractor, Dr. Carlos Diaz, who began conservative chiropractic treatment.
Meanwhile, on July 13, 1995, Labareena was seen by Dr. Mimeles for |4the purpose of obtaining a independent medical examination. Dr. Mimeles saw nothing to suggest that Labareena had any structural or mechanical problems with his back. He concluded that Labareena might have suffered a lumbar strain which would resolve within two months.
On August 29, 1995, Dr. Diaz discharged Labareena because his condition did not improve with the conservative treatment. Dr. Diaz suggested that Labareena be seen by an orthopedic or neurosurgeon for further evaluation and care.
Eventually, Labareena consulted an orthopedist of his choice, Dr. Raul Diaz, who treated him from October 9, 1995 through November 15, 1996. On the initial visit, Dr. Diaz ordered x-rays which revealed mild hy-pertrophic changes and a spondylolysis defect at the L5 level bilaterally. Dr. Diaz’s initial impression was that Labareena had sustained a lumbar strain and he found him to be temporarily totally disabled.
At the request of Dr. Diaz, Labareena underwent a repeat MRI of the lumbar spine on November 9, 1995. When Dr. Diaz saw Labareena on November 17, 1995, Dr. Diaz reported the following regarding the results of the MRI:
His. MRI results came back with evidence of L-5 spondylolysis defect. This was not present on his previous MRI. This could also explain the patient’s persistent back pain that he has been having. There appears to be a degenerated disc at L5-S1 with minimal central protusion and no spondylolisthesis at L-5 as well.
Dr. Diaz ordered a bone scan and he recommended a custom molded polyethylene brace in order to treat the spondylolysis defect.
| sOn January 23, 1996, a bone scan was performed and the results were unremarkable. After reviewing the test results and examining Labareena on January 26, 1996, Dr. Diaz’s reported the following:
... I believe that what we have now is a spondylolisthetic defect that is not acute in *481 nature, but was aggravated by the trauma he suffered while at work.
Dr. Diaz again recommended the polyethylene brace, and he noted that if it completely relieved Labareena of his pain, then he would consider fusing his back.
In responding to Dr. Diaz’s recommendation for the polyethylene brace, Dr. Mímeles stated the following in a letter to Schweg-mann dated January 31,1996:
I would like to see the results of the Bone Scan. Based on the findings thus far, this gentleman has an incidental spondylolysis on the left side only. He does not have a spondylolisthesis. In my opinion, he' does not have an unstable spine. If this gentleman’s back needs to be braced, I see no reason to go to any type of large polyethylene brace. There is an excellent chance that because of this being cumbersome he is not going to wear it. If I was going to brace this gentleman’s back, he could do very nicely with a lumbosacral corset for support of the muscles. This gentleman does not have an unstable spine. In my opinion, he does not need a brace of this magnitude.
Considering the conflicting opinions regarding Labarcena’s need for the polyethylene brace, Schwegmann filed a request for an independent medical examination with the Office of Worker’s Compensation on February 26,1996. However, the Office denied the request on March 28, 1996, because Dr. Mí-meles’ report of January 31, 1996 was completed 16without reviewing the bone scan.
Subsequently, the bone scan results were provided to Dr. Mimeles. In a letter dated April 29, 1996, he stated that he did not see any reason why Labareena could not be back at full gainful employment and he thought that Labareena had reached maximum medical improvement.
Eventually, the Office of Worker’s Compensation scheduled an independent medical examination for Labareena with Dr. LaBorde on June 10, 1996. Dr. LaBorde’s impression was that Labareena had pre-existing degenerative arthritis and superimposed pain with persistent pain of uncertain etiology. Dr. LaBorde did not see objective evidence of an injury which would cause him long term problems. It was Dr. LaBorde’s opinion that Labareena was physically capable of working. Dr. LaBorde stated that Labarcena’s options consisted of “return to work on a trial basis now or later. Or change him to fighter work.” Dr. LaBorde further stated that he was in agreement with Dr. Mímeles’ opinion that Labareena had reached maximum medical improvement and was physically capable of returning to work from an objective standpoint.
Based on Dr. LaBorde’s medical opinion, Schwegmann terminated Labarcena’s disability benefits on June 30, 1996. At that time, Schwegmann had paid benefits for 58 weeks and six days totalling $11,886.20. Additionally, when Labareena returned to work to Schwegmann, he was assigned work which exceeded his restrictions, and because he was unable to perform the work, he was asked to leave the store.
On July 12, 1996, Labareena filed a disputed claim for worker’s ^compensation benefits asserting that Schwegmann had wrongfully terminated benefits. Specifically, Labareena alleged that he was still disabled and that such a condition was supported by the opinion of Dr. Diaz.
Labareena continued to receive treatment from Dr. Diaz, and on August 16, 1996, Dr. Diaz provided Labareena with note which stated: “As of this date the above patient is totally disabled from any occupation due to his complaints of chronic back pain and his diagnosis of bilateral spodylolisis (sic) of L5.” Labareena last visit with Dr. Diaz was on November 15,1996, and at that time Dr. Diaz was still recommending the polyethylene brace; however, Schwegmann never did authorize it.
After moving to Miami, Florida, Labareena received treatment for his back at Jackson •Memorial Hospital on December 14, 1996. Labareena was again admitted to Jackson Memorial in January of 1997 having suffered a stroke, and at that time he provided the hospital with a history of having sustained a trauma to his back as well as his head in May of 1995. Additionally, an MRI revealed diffuse abnormal signals of the left cerebral *482 artery which might by related to a prior trauma.
In March and April of 1997, Labarcena was treated by Dr. Jose Munoz, a neurologist. In addition to his complaints of back pain, Labarcena complained of confusion, memory loss and headaches. Dr. Munoz’s impression was that the headaches and cognitive impairment were likely due to head trauma.
Additionally, Labarcena consulted a psychologist, Dr. Jose Dergan, who diagnosed Labarcena as suffering from post-concussion brain |8syndrome, and received treatment at Camillus Health Concern for his back and neurological problems.
Finally, the trial testimony of Labarcena established that he is still receiving treatment for his back and neurological problems and Dr. Raul Diaz’s testimony showed that Labarcena’s back condition has deteriorated.
At the conclusion of the trial, the judge took the matter under advisement and allowed both parties to file post-trial memoran-da. Subsequently, the judge rendered judgment finding that Labarcena was injured during the course and scope of his employment and awarded him temporary total disability benefits. The court further ordered payment of all medical bills and expenses including the polyethylene brace, with credit for all expenses and benefits previously paid. The court additionally found Sehwegmann acted arbitrarily and capriciously in refusing to pay for the brace and in refusing to pay benefits and the court assessed penalties and attorney fees. It is from this judgment that Sehwegmann appeals urging three assignments of error.
TEMPORARY TOTAL DISABILITY BENEFITS
Sehwegmann argues that Labarcena did not prove his disability beyond the June 30, 1996 and therefore the court erred in awarding temporary total disability benefits beyond that date.
Temporary total disability benefits shall cease when the employee’s physical condition has improved to the point that continued regular treatment by a physician is not required. LSA-R.S. 23:1221(l)(d). Any entitlement to such benefits requires the employee to show by clear and ^convincing evidence, unaided by any presumption of disability, that the claimant is physically unable to engage in any employment. LSA-R.S. 23:1221(l)(c).
The issue of disability is a factual determination. Rideaux v. St. Landry Parish School Board, 97-1616 (La.App. 3 Cir. 4/8/98), 711 So.2d 819. Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong. Thus if the factfinder’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Banks v. Industrial Roofing & Sheet Metal, Inc., 96-2840 (La.7/1/97), 696 So.2d 551.
In awarding Labarcena temporary total disability benefits, the court accorded greater weight to the testimony of the treating physician, Dr. Raul Diaz, and we find that credibility determination to be reasonable based on the record as a whole. Considering that his trial testimony established that Labarcena’s chronic back pain remained problematic and in fact deteriorated, we find no manifest error in the award of temporary total disability benefits.
I mCAUSAL CONNECTION
Sehwegmann contends that there was no evidence presented establishing a link between the stroke suffered in January of 1997 and the May 9, 1995 work-related accident.
An employee in a worker’s compensation action has the burden of establishing a casual link between the accident and the subsequent disabling condition. Wooley v. E.J.D. Builders, Inc., 94-955 (La.App. 5 Cir. *483 1/30/96), 668 So.2d 1221, writ denied, 96-0506 (La.4/8/96), 671 So.2d 338.
The judgment rendered by the court ordered Schwegmann to pay all medical bills and expenses; however, in her reasons for judgment, the judge stated:
The claimant received additional treatment in Miami... .Those medicals confirm that the claimant’s chronic lower back pain has continued. The claimant’s medical condition has deteriorated. Claimant has other medical 'problems which do not relate to his accident at Schwegmann. But, the back problems have never been resolved or properly treated, (emphasis added)
We likewise find that the causal relationship between the stroke and the accident was not established and we note that Labarcena never reported to Schwegmann that he hit his head in the accident. Moreover, he never informed his treating physicians, Dr. Raul Diaz and Dr. Carlos Diaz, or any of the other physicians who examined him in the New Orleans area of having sustained a head trauma. Accordingly, we amend the judgment by restricting the award of payment of medical bills and expenses to the back Ininjury.
PENALTIES AND ATTORNEY FEES
In assessing penalties and attorney fees, the court found that Schwegmann acted arbitrarily and capriciously in refusing to pay for the polyethylene brace and in refusing to pay disability benefits. Schwegmann argues that this finding constitutes manifest error.
Initially, it is noted that the penalty provisions in effect at the time of the injury control in worker’s compensation cases. Kortz v. Colt Energy Services, Inc., 97-159 (La.App. 5 Cir. 7/29/97), 698 So.2d 460.
At the time of the injury, LSA-R.S. 23:1201(E)[2] provided that penalties were not to be assessed when the employee’s right to receive compensation or medical benefits had been reasonably controverted by the employer or insurer. The test to determine whether the employee’s right to | ^benefits was reasonably controverted- was set forth in Watson v. Amite Milling Co., Inc., 560 So.2d 902, 906 (La.App. 1 Cir.1990), writ denied, 567 So.2d 614 (La.1990), citing Chelette v. American Guarantee and Liability Insurance, Inc., 480 So.2d 363, 367 (La.App. 3 Cir.1985), as follows:
[GJiven the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were' not due the employee. Stated another way, did the employer or his insurer have sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. This test requires a close analysis of each worker’s compensation case.
Additionally, LSA-R.S. 23:1201.2[3] provided that there must be a finding that the *484 employer acted arbitrarily and capriciously and without probable cause before attorney’s fees could be assessed.
Whether an employer’s refusal to pay benefits warrants the imposition of penalties and attorney’s fees is a factual question which will not be disturbed on appeal in the absence of manifest error. Kortz v. Colt Energy Services, Inc., supra.
113In refusing to pay for the polyethylene brace, Schwegmann based its decision on the advise of Dr. Mímeles who suggests a lumbo-sacral corset as an alternative. Additionally, in terminating disability benefits, Schweg-mann relied on the report of Dr. LaBorde, who had performed an independent medical examination and had found him to be physically capable of working.
Accordingly, we find that Schwegmann had sufficient information to reasonably counter Labareena’s need for the polyethylene brace and his claim of continued disability and therefore the court committed manifest error in assessing penalties and attorney fees.
For the foregoing reasons, we affirm the award of temporary disability benefits, amend the award of payment of medical expenses and reverse the assessment of penalties and attorney fees.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART.

. Labareena speaks no English.

. LSA-R.S. 23:1201(E) provided as follows:
If, pursuant to this Chapter, any compensation or medical benefits payable without an order is not paid within the time period provided in Subsection B, C, or D of this Section, there shall be added to such unpaid compensation a penalty of an amount equal to twelve percent thereof or a total penally of not more than fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid, whichever is greater, which shall be paid at the same time as, and in addition to, such compensation, unless such nonpayment results from conditions over which the employer or insurer had no control. No amount paid as a penalty under this Subsection shall be included in any formula utilized to establish premium rates for worker’s compensation insurance. Whenever the employee’s right to such compensation or medical benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply. The twelve percent or fifty dollars per calendar day, whichever is greater, additional payment shall be assessed against either the employer or the insurer, depending upon who was at fault in causing the. delay. No worker's compensation insurance policy shall provide that this sum shall be paid by the insurer if the administrative hearing officer determines that the twelve percent or fifty dollars per calendar day, whichever is greater, additional payment is to be made by the employer rather than the insurer. Any additional compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee. The total fifty dollar per calendar day penalty provided for in this Subsection shall not exceed two thousand dollars in the aggregate.

. LSA-R.S.23:1201.2 provided as follows:
Any insurer liable for claims arising under this Chapter, and any employer whose liability for *484 claims arising under this Chapter is not covered by insurance, shall pay the amount of any claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim, or in the event a partial payment or tender has been made, to payment of all reasonable attorney's fees for the prosecution and collection of the difference between the amount paid or tendered and the amount due.