# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-723


**DEXTER BENJAMIN**

**VERSUS**

**LAFAYETTE PARISH SCHOOL BOARD**

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT # 4
PARISH OF LAFAYETTE, NO. 02-09480
HONORABLE SHARON MORROW, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*
**JOHN B. SCOFIELD**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Michael G. Sullivan, and John B. Scofield, Judges.[*]

**AFFIRMED.**


**Dexter Benjamin**
**In Proper Person**
**213 Morelan Drive**
**Lafayette, LA 70507**
**Counsel for Plaintiff/Appellant:**
    **Dexter Benjamin**

**L. Lane Roy**
**Dawn L. Morris**
**Preis, Kraft & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**Counsel for Defendant/Appellee:**
    **Lafayette Parish School Board**

---

[*]Honorable John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

SCOFIELD, Judge.[1]

Claimant, Dexter Benjamin, appeals a decision of an Office of Workers'

Compensation Judge (WCJ) in favor of Defendant, the Lafayette Parish School

Board, dismissing Claimant's petition for additional benefits past December 2002,

when Claimant's treating physician opined that Claimant had reached maximum

medical improvement. We affirm the decision of the WCJ.

**PROCEEDINGS BEFORE THE WORKERS' COMPENSATION JUDGE**

The WCJ, after carefully and thoroughly considering all the evidence and

testimony, issued the following "REASONS FOR JUDGMENT," with which we

agree and adopt as our own (emphasis ours):

> This matter came for trial on the issues of whether the claimant's current left arm complaints are related to his 1996 work accident and whether the employer properly terminated workers' compensation indemnity benefits as of January 28, 2002. For the reasons that follow, the Workers' Compensation Judge ("WCJ") finds in favor of the employer on both issues.

> In June 1996 Dexter Benjamin ("Benjamin") was employed as a custodian with the Lafayette Parish School Board ("School Board"). On or about June 3, 1996, he slipped and fell while working resulting in injuries to his neck and back. The current claim concerns impingement tendonitis at the left shoulder. That diagnosis was not made until some two years after the 1996 accident and after an intervening motor vehicle accident in January of 1998. Therefore, the development of shoulder symptoms must be viewed both before and after the January 1998 accident.

> Immediately after the 1996 accident, Benjamin treated with Dr. St. Cyr and Dr. Nickerson. The parties did not provide those initial records of treatment so the WCJ has no information about Benjamin's complaints immediately after the work accident. The first available report is that of Dr. David S. Muldowny, the orthopedic surgeon who treated Benjamin for the work accident. Dr. Muldowny's December 16, 1996 report begins with the following history: "This is a 37 year old male, complaining of primarily neck pain, but also low back pain since

[1]Honorable John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

1

June of 1996." Under "Current Symptoms" Dr. Muldowny notes: "He is complaining of neck pain, headaches, occasional right arm pain and shoulder pain with a bilateral shocking sensation in his hands." Dr. Muldowny considered surgery as an option.

On March 11, 1997, Benjamin was examined by Dr. Gregory Gidman, the employer's choice of orthopedic specialist. In his "cervical spine & upper extremity exam" Dr. Gidman found no muscle atrophy or muscle fasciculation in the upper extremities. The shoulder range of motion was full.

Dr. Muldowny had Benjamin seen by Dr. Cobb for a discogram. The discography report of June 12, 1997 indicated three levels of cervical disease but noted "the 5-6 level was the level that reproduced the left arm pain" and "was the worse space in terms of pain with reproduction of neck pain and left sided radiculitis." In September 1997 Dr. Muldowny perfomed an anterior cervical fusion at three levels. After the surgery, Dr. Muldowny saw Benjamin on October 2, November 6, and December 4, 1997. *At the visits in October and November, Benjamin made no complaints of arm or shoulder pain.* (Dr. Muldowny's deposition, page 23). In his report of December 4, the doctor noted Benjamin was still having significant pain, with some pain in the shoulder blade region. Dr. Muldowny testified since he did not indicate the pain was on either one side of the body or the other and assumes it was on both sides. (Dr. Muldowny deposition, page 25).

The December 4, 1997 exam was the last physical examination of Benjamin prior to the January 1998 motor vehicle accident. *From the beginning of Dr. Muldowny's treatment until this time, there are no complaints of left shoulder pain.* There are complaints of right arm pain, left arm pain, and complaints of shoulder pain, but *no complaints specific to the left shoulder.* In fact, Benjamin's pain drawings depicts [sic] stabbing pain to both shoulders. (See defendant's exhibit #4 and plaintiff's exhibit #1, item 6, records from Orthopedic & Sports PT Clinic of Lafayette).

Benjamin was involved in a motor vehicle accident on January 8, 1998. He was seen by Dr. Muldowny on February 12, but failed to mention the automobile accident. The doctor noted that "his neck is improved" and wanted to try to rehabilitate his neck muscles and shoulders, meaning both shoulders. (Dr. Muldowny deposition, pages 25-26). Benjamin next saw Dr. Muldowny May 11, and the doctor found him "overall better than before surgery" with "some left trapezius tenderness" and "his range of motion is quite good" referring probably to the neck. (Dr. Muldowny deposition, page 27). A functional capacity evaluation performed by Dr. Hodges on May 26 classified Benjamin at medium duty capacity.

The next day, May 27, Benjamin began seeing Dr. Jerald L. Watts, an orthopedic surgeon, for injuries associated with the January 8 automobile accident. Benjamin testified in his August 3, 2000 deposition that he treated with a different doctor in the same field of specialty to avoid "confusion." (Defendant's exhibit 12, page 36). In his report of May 27, Dr. Watts noted complaints of pain in the neck and both shoulder blades, radiating into the left upper extremity to the mid forearm, and numbness and tingling in the left upper extremity to the fingers. Dr. Watts found no atrophy or weakness in the major muscle groups of the upper extremities.

Over the next few months Benjamin continued to treat with both Dr. Muldowny and Dr. Watts, then Dr. Shepherd when Dr. Watts retired. Significantly, as of his July 30, 1998 exam, Dr. Muldowny began testing Benjamin for possible rotator cuff and impingement problems. On July 30 those tests were negative. (Dr. Muldowny's deposition, page 33). On August 25 the rotator cuff test produced pain but no weakness and the impingement sign was mildly positive. (Dr. Muldowny deposition page 36). In his report of September 28, 1998, Dr. Muldowny noted there was no pain or weakness on the rotator cuff testing. He recommended EMG/NCV testing which showed subacute left C5 radicular changes and carpal tunnel syndrome. In his October 22, 1998 report, Dr. Muldowny indicates that the rotator cuff and impingement tests are negative and opines that Benjamin's shoulder symptoms are a residual from his neck. Dr. Muldowny then released Benjamin to light duty, with restrictions.

*In his report of November 17, 1998, Dr. Shepherd noted mild deltoid atrophy and a slightly positive impingement test. Dr. Shepherd reviewed the results of the EMG/NCV testing and stated that the left C5 radicular changes could contribute to the atrophy he found, but believes the atrophy could also be from a shoulder injury. Dr. Shepherd states that Benjamin "really seems to be very concerned about his left shoulder, and he says he cannot abduct the shoulder greater than 90 degrees. He was able to do that before the accident. He thinks the car accident aggravated it more, and there is more damage."* Yet less than a month later Benjamin saw Dr. Leo deAlvare for a neurological exam at the request of the workers' compensation employer and told Dr deAlvare that he was involved in a motor vehicle accident in January "but he does not feel that he sustained much in the way of injuries." (plaintiff's exhibit #1, item 7, December 15, 1998). The day [of] the exam with Dr. deAlvare, Benjamin saw Dr. Shepherd. In his report of December 16, 1998, Dr. Shepherd found mild deltoid atrophy and winging of the left shoulder with atrophy of the left interscapular musculature. Dr. Shepherd thought these conditions could be from the neck or should[er], but thought it more likely they were coming from a shoulder condition. Dr. Shepherd then notes:

3

"This man tells me that *before the accident of January 8, 1998*, he had pain in his neck and pain in his back, but *he had no problems with his shoulder whatsoever.* He states that as a result of the motor vehicle accident it increased the intensity of the pain in his neck and back and increased the frequency of the pain in his neck and back and caused the shoulder condition."

On January 4, 1999 Dr. Muldowny noted that Benjamin "continues to complain of headaches and left arm pain. *He relates his current condition to an automobile accident in January 1998. This incident aggravated his neck."* An MRI of the shoulder ordered by Dr. Shepherd indicated signs of impingement with no evidence of a rotator cuff tear.

Benjamin continued treating with Dr. Muldowny. The December 16, 1998 visit appears to have been Benjamin's last exam with Dr. Shepherd. Dr. Muldowny recommended an arthroscopic decompression of the left shoulder. Dr. Muldowny and the workers' compensation administrator questioned the relation of the left shoulder symptoms to the 1996 work accident. However, *when Benjamin later told Dr. Muldowny his complaints are the same complaints he has had since 1996, Dr. Muldowny related the shoulder injury to the 1996 accident.*

The WCJ does not relate the shoulder bursitis/impingement condition to the 1996 work accident. *Dr. Muldowny admits in his deposition that Benjamin's symptoms change at different times, making it difficult "to really get a feel that on every single visit it's the same thing" and causing the doctor to question whether the arthroscopic decompression would really help.* (Dr. Muldowny deposition page 94)[.] Therefore, even though Dr. Muldowny ultimately relates the shoulder condition to the 1996 work injury, his testimony is equivocal and it appears he relates it primarily because his patient tells him it is the same pain. On the other hand, Dr. Shepherd relates the impingement to the automobile accident. Benjamin has told Dr. Shepherd that the shoulder injury was caused by the automobile accident. *Further, and quite significantly, Dr. Shepherd testified that had the impingement been present for a long time, it would have caused a tear in the rotator cuff.* (Dr. Shepherd's deposition, page 61).

The evidence available points to the January 1998 motor vehicle accident as the more likely cause of the shoulder impingement. Dr. Watts found no atrophy in May 1998. Dr. Shepherd first noted mild atrophy six months later in November. The EMG of October 15, 1998 showed "subacute" C5 radicular changes, which Dr. Shepherd defined as six weeks to a year [old]. (Dr. Shepherd deposition page 26). The

4

left shoulder MRI of around December 1998 showed a spur on the rotator cuff "creating early impingement syndrome." (Dr. Shepherd deposition, pages 51-52). Dr. Shepherd testified that it takes "months" for spurs to develop. (Dr. Shepherd deposition, page 51). Logic points to an event in January 1998 as causing the changes seen later that year as opposed to an event more than two years earlier. Benjamin['s] testimony to the contrary cannot be given any credence due to the different versions he espoused to different doctors.

The WCJ further finds that indemnity benefits were properly terminated in December 2002 after Benjamin's treating physical medicine doctor, Dr. Nickerson, found him to have reached maximum medical improvement and approved several sedentary jobs.

## LAW AND DISCUSSION

It is well settled that a workers' compensation claimant must prove by a preponderance of the evidence, not only that an employment accident occurred, but that the accident had a causal relationship to the disability claimed; if the testimony and documentary evidence leave the probabilities evenly balanced, the claimant has failed to carry his burden of proof. *Harvey v. Bogalusa Concrete, Inc.*, 97-2945 (La.App. 1 Cir. 9/25/98), 719 So.2d 1130; *Wilkerson v. City of New Orleans Fire Dep't.*, 03-1550 (La.App. 4 Cir. 3/3/04), 871 So.2d 375; and *Grant v. Assumption Parish Sch. Bd.,* 01-0272 (La.App. 1 Cir. 3/28/02), 813 So.2d 622.

The law applicable to the appellate review of workers' compensation cases is likewise well settled:

Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Industrial Roofing & Sheet Metal Works*, 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556; *Smith v. Louisiana Dep't of Corrections*, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; *Freeman v. Poulan/Weed Eater*, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Banks*, 96-2840 at pp. 7-8, 696 So.2d at 556; *Freeman*, 93-1530 at p. 5, 630 So.2d at 737-38; *Stobart v. State*, 617 So.2d 880, 882 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them

> can never be manifestly erroneous or clearly wrong. *Banks*, 96-2840 at
> p. 8, 696 So.2d at 556; *Stobart*, 617 So.2d at 882. "Thus, 'if the
> [factfinder's] findings are reasonable in light of the record reviewed in
> its entirety, the court of appeal may not reverse, even if convinced that
> had it been sitting as the trier of fact, it would have weighed the
> evidence differently.'" *Banks*, 96-2840 at p. 8, 696 So.2d at 556
> (quoting *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112
> (La.1990)).

*Seal v. Gaylord Container Corp.*, 97-0688, pp. 4-5 (La. 12/02/97), 704 So.2d 1161,

1164.

In the case sub judice, the WCJ considered all the testimony and documentary

evidence and reached the conclusion that Claimant failed to prove his left shoulder

complaints were connected to his on-the-job injury, but rather resulted from his

vehicular accident of January 8, 1998. Examining the documentary evidence and

testimony, we cannot say that her conclusion was manifestly erroneous. We are

especially persuaded by those portions of her well-written reasons for judgment to

which we have added emphasis. First, Dr. Muldowny's records show Claimant made

no shoulder complaints on his October, November or December 1997 visits; Dr.

Muldowny's notes of Claimant's January 1999 visit revealed that Mr. Benjamin,

himself, related his shoulder complaints to his January 1998 vehicular accident; and

Dr. Muldowny's deposition testimony stated that Claimant's symptoms were different

at different times, making it difficult to accurately diagnose Claimant's problems.

Second, there are the reports and testimony of Dr. Shepherd which point out that

Claimant admitted that his inability to abduct his left shoulder above 90 degrees did

not occur until after the 1998 automobile accident; likewise there is Claimant's

statement to Dr. Shepherd that before the January 1998, he had no problems

whatsoever with his shoulder. Dr. Shepherd testified that had the shoulder

impingement been present for a long period of time, it would have caused a tear in the rotator cuff. Tests confirmed Claimant had no tear in his rotator cuff.

In sum, we agree with the WCJ that Dr. Muldowny's conclusion, that Claimant's present shoulder discomfort could relate to the 1996 on the job accident, was based upon his patient's very belated, self-serving complaints. Furthermore, we find no manifest error in the WCJ's decision to give more credence to that abundant portion of the medical evidence, especially that of Dr. Shepherd, which relates Claimant's present complaints to the automobile accident of January 8, 1998.

Accordingly, for the reasons stated, we affirm the judgment of the Office of Workers' Compensation Judge. All costs of this appeal are assessed against Claimant, Dexter Benjamin.

**AFFIRMED.**