854 So.2d 960 (2003)
Sheryl STELLY
v.
HEALTH SOUTH REHABILITATION.
No. 2003-171.
Court of Appeal of Louisiana, Third Circuit.
July 2, 2003.
*961 Donald L. Mayeux, Attorney at Law, Eunice, LA, Counsel for Plaintiff/Appellee: Sheryl Stelly.
Russell L. Sylvester, Brittain & Sylvester, Natchitoches, LA, Counsel for Defendant/Appellant: Health South Rehabilitation.
Court composed of BILLIE COLOMBARO WOODARD, JIMMIE C. PETERS, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
Health South Rehabilitation Hospital (Health South) and ESIS Insurance Company appeal a judgment awarding Sheryl Stelly, a former rehabilitation nursing technician: (1) temporary total disability benefits of $340/week from the date they were terminated, December 19, 2001; (2) back surgery recommended by her treating physicians, Dr. John Cobb and Dr. Daniel Hodges; (3) $2,000 in penalties for the refusal to authorize the surgery; (4) $8,500 in attorney fees; and (5) costs. For the following reasons, we affirm the judgment as amended below.

*962 Discussion of the Record
Ms. Stelly alleges that she was injured on February 14, 2000, while transferring a patient from a wheelchair to a bed. After immediately reporting the accident to the duty nurse, she sought treatment at a hospital emergency room, per a supervisor's instructions. She has not returned to work since the date of the accident.

Medical Records
An MRI of February 18, 2000 revealed a very small disc protrusion at L5-S1 lateralizing to the right and compressing the right nerve root only slightly. She was also seen by her family physician, Dr. Luris Sanchez, who recommended an orthopedic consultation with Dr. Cobb.
On February 28, 2000, Ms. Stelly reported to Dr. Cobb that she was experiencing mild to severe headaches, numbness in both hands, and a stabbing, burning pain in the mid to low back area that radiated into both hips and legs. She rated her pain level as eight out of ten and stated that she could not sit or stand for long periods of time. After reviewing the MRI, which Dr. Cobb believed showed an abnormal L5-S1 disc, he diagnosed a sprain/ strain of the thoracolumbar area and a herniated nucleus propulsus at L5-S1, with anterior column failure and S1 nerve root irritation. Dr. Cobb recommended a physical therapy program, a selective nerve block at L5-S1, and referral to Dr. Hodges, a pain management specialist, for an EMG. On March 23, 2000, Dr. Hodges performed an upper-extremity EMG that yielded normal results.
At Defendants' request, Ms. Stelly was examined by Dr. Gregory Gidman on May 5, 2000. During his examination, Dr. Gidman noted Ms. Stelly exhibited moderate limitation upon leaning left and right and severe limitation upon hyperextension; however, he recorded three out of five positive Waddell signs, indicating that psychological factors were involved, and inconsistent results on straight leg raising. Dr. Gidman concluded that the examination revealed no objective findings, and he interpreted the MRI as "extremely benign." He recommended a weight reduction program, home therapy, and medications such as anti-inflammatory drugs, muscle relaxants, and mild analgesics, but he did not agree with Dr. Cobb that a nerve block was necessary. Dr. Gidman also believed that she could perform light activities, with no lifting over twenty pounds.
On June 21, 2000, Dr. Cobb performed the nerve block, but at her return visit on July 12, 2000, Ms. Stelly stated that it did not give her much relief. At that time, Dr. Cobb first discussed performing a posterior lumbar interbody fusion at L5 S1. Upon this recommendation, Defendants again requested an examination by Dr. Gidman. On August 15, 2000, Dr. Gidman recorded a normal examination, even though Ms. Stelly reported that her symptoms had worsened since her last visit. Dr. Gidman disagreed that a fusion was necessary because he found no evidence of instability, and he did not believe that the protrusion shown on the MRI was causing her symptoms.
On October 26, 2000, Ms. Stelly attempted a functional capacity evaluation (FCE) with Dr. Hodges, but testing was aborted because of her complaints of pain and because she began shaking throughout her body during some of the tests. She attempted a second FCE on November 22, 2000 at New Day Rehabilitation, but it, too, was not successfully completed based upon her complaints of pain and on the evaluator's opinion that she exhibited submaximal effort.
On November 28, 2000, Dr. Thad Broussard, an orthopedic surgeon, examined Ms. Stelly at the request of the Office of Workers' *963 Compensation. At that visit, Ms. Stelly complained of pain every day that was aggravated by sitting, standing, bending, and lifting. She reported a similar accident that occurred in 1996, but stated that she only had intermittent discomfort before the present accident, which produced more intense symptoms. During the examination, Ms. Stelly complained of generalized tenderness in the low back, slightly worse on the right, but Dr. Broussard did not detect any spasm or any "true tension signs" that would indicate a compressed nerve. Dr. Broussard believed that the L5-S1 disc, which he described as "definitely protruding," was the most likely cause of her symptoms, but he did not believe that the disc was compressing the nerve root. At that time, he could not say that surgery would improve Ms. Stelly's condition, but he recommended a lower-extremity EMG and a repeat MRI. He also recommended an FCE, not knowing that Dr. Hodges had recently attempted one.
On March 28, 2001, Ms. Stelly underwent a repeat MRI that revealed minor desiccation and a minimal central disc bulge at L5-S1, with no evidence of nerve root displacement or compromise. After reviewing this test, Dr. Cobb continued to recommend surgery, noting that "she is really desiring additional help with the pain and I have recommended surgery close to a year ago." He also prescribed Paxil for depression, in addition to the Norco that she had been taking for pain.
In April of 2001, Dr. Cobb referred Ms. Stelly to Dr. Hodges for pain management, in light of her "unabating" complaints of low back pain radiating to both lower extremities. Dr. Hodges performed an EMG and nerve conduction study that indicated a mild right S1 radiculitis. Interpreting these results as consistent with anatomic findings, Dr. Hodges thought it "imperative" that Ms. Stelly consider surgical intervention "sooner than later," as he believed that a prolonged delay would result in continued nerve damage, even after surgery. When surgery was not approved by June of 2001, Dr. Hodges referred Ms. Stelly to the charity hospital system, even though an appointment was not available until May of 2002. In the meantime, he continued palliative pain management with Norco and added a prescription for Xanax, as Ms. Stelly was becoming increasingly anxious over pending legal issues. He considered her to be disabled from any form of employment.
On March 14, 2002, Dr. Harold Heitkamp examined Ms. Stelly for Social Security disability purposes. Although he did not find spasm in the paralumbar area, Dr. Heitkamp noted that Ms. Stelly was very tender at L5-S1, with pressure on the right and left producing pain down the right thigh to the right ankle. He recorded decreased range of motion in forward flexion, extension, and lateral flexion of the lumbar spine, as well as straight leg raising positive for sciatic irritation on the right. He also noted decreased flexion in the right knee as opposed to full range of motion in the left. He interpreted x-rays as showing marked desiccation of the L5-S1 disc with spondylosis of S1. His impression, based upon the patient's chart, history, and physical findings, was "desiccation L5 S1 and a small herniated disc at this level with marked [r]adiculitis in both legs, more marked on the right leg." He also commented that she "appears to be in quite a bit of pain now." Aware that Ms. Stelly was awaiting evaluation at a charity hospital for "probable surgery for her herniated disc with marked [r]adiculitis," Dr. Heitkamp believed that crutches would be beneficial until she underwent surgery. Based upon his findings of severe radiculitis in the right leg and marked limitation of motion, Dr. Heitkamp stated that there *964 should be "no prolonged standing, no squatting, no walking, no sitting for any length of time."
Dr. Gidman examined Ms. Stelly for a third time on August 7, 2001. He noted that she had moderate limitation on right and left lateral bending and hyperextension, but that her straight leg raising was markedly inconsistent and that, again, three out of five Waddell's signs were positive, indicating that psychological factors were involved in her subjective complaints. Dr. Gidman did not believe that the "minimal bulge" on her MRI scans corroborated Dr. Hodges' finding of an S1 radiculitis, citing a report that similar protrusions have been found in 27% of normal individuals. Given that "the most recent MRI does not report any protrusion, just a minimal bulge with no evidence of any nerve root compromise or displacement," Dr. Gidman assigned her a 0-5% body impairment, with a recommendation for home therapy, weight reduction, and return to sedentary to light work activities. He believed that a lumbar fusion offered her only a small chance of functional improvement.
On May 12, 2002, Dr. Broussard examined Ms. Stelly for a second time. He recorded generalized tenderness in the paravertebral region, but without spasm; numbness on pin prick; and equal, but diminished, reflexes. He also noted that she complained of pain on simple pinching of the skin, without pressure in the deeper musculoskeletal areas, and that she exhibited self-limiting maneuvers. He had no doubt that her L5-S1 disc was damaged, and that she most likely had an inflammation of the S1 nerve root, but he questioned whether surgery would make her functionally better, given that she did not have "hard objective physical findings." However, he also recognized that more aggressive surgeons would consider surgery, based upon her chronic pain and MRI and EMG results, and that he would not "stand in the way" if the patient and the surgeon chose such a course of treatment. On June 11, 2002, he issued a supplemental report after reviewing the second MRI scan. He believed that the film clearly showed changes in the L5-S1 disc. It was definitely protruding and pushing more on the right side, which he considered consistent with an S1 radiculitis on the right side. However, he did not change his previous recommendations, as he did not believe that the disc was obviously compressing the spinal elements.
Ms. Stelly continued pain management with Dr. Hodges, who believed that she suffered from symptomatic L5-S1 disc disease, progressive lumbosacral instability, and a lumbar radiculopathy. On July 10, 2002, he administered a series of steroid injections into the left and right sacroiliac joints, iliolumbar ligaments, and paraspinal muscles to reduce inflammation, but Ms. Stelly reported that the injections helped only for a few days. He also added Remeron, an anti-depressant, to her medications for her "clearly escalating anxiety and depression." Both he and Dr. Cobb did not believe that she was capable of working pending surgery.
On January 10, 2002, Dr. Gidman approved a modified "rehab tech" position that Health South would offer to Ms. Stelly by correspondence dated January 25, 2002. Ms. Stelly's benefits, however, had been terminated on December 19, 2001.

Trial Testimony
At trial, Ms. Stelly acknowledged that she had previously been restricted to light-duty employment after a work-related back injury in 1996. However, she testified that by the time she applied for the position at Health South in 1999, she was only experiencing intermittent backaches and was able to perform all the duties of *965 her job, including the lifting requirements. She further testified that she regularly worked overtime at Health South of up to sixteen hours a day, seven days a week, and that she often volunteered to work on her day off. She admitted that she did not report the earlier back injury on Health South's post job-offer questionnaire because she was not having back problems at that time, but she did note that she had filed a previous workers' compensation claim and she insisted that she had discussed her prior injury with the person that interviewed her, who in turn called that employer for a reference. She testified that she did not accept the modified position approved by Dr. Gidman because she could not tolerate being on her feet most of the day and because she believed she could not handle all aspects of patient care that would be required when she answered their calls.
Barbara Stelly, Health South's human resource manager, testified that someone restricted to light duty would not have been qualified for the original rehab nursing position, as it was a strenuous job that required much lifting. She further testified that an investigation into Ms. Stelly's 2000 accident revealed that no one had prior knowledge of her first back injury, although she also acknowledged that she was not hired by Health South until thirteen months after Ms. Stelly's accident there.

Temporary Total Disability Benefits
Defendants argue that the workers' compensation judge (WCJ) erred in awarding Ms. Stelly temporary total disability benefits because the medical evidence indicates that she can now perform light-duty work. They further contend that, because she had been previously restricted to light duty as the result of her 1996 accident, any disability that she may now suffer is not the result of her February 2000 accident at Health South.
To recover temporary disability benefits, an employee must prove:
by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
La.R.S. 23:1221(1)(c).
In Johnson v. NATCO (Port of New Iberia), 94-1236, p. 4 (La.App. 3 Cir. 3/1/95), 651 So.2d 494, 496-97 (citations omitted), we reiterated the following principles for reviewing a workers' compensation temporary total disability claim:
The finding of disability within the framework of workers' compensation law is a legal rather than purely medical determination. It is the totality of the evidence, both medical and lay testimony, which must be examined by the trial court in making its determination on the question of disability and it is the function of the court to assess the weight to be accorded such testimony. The opinion of a physician or other medical expert does not necessarily establish the existence of vel non a legal disability and the court may accept or reject such opinion testimony depending upon what impression the qualifications, credibility and testimony the particular expert makes upon the court. As a general rule, the testimony of a treating physician should be given more weight than that of a physician who examined a claimant for diagnostic purposes. However, the positive findings of medical experts are *966 to be afforded greater weight than negative findings as to the existence or not of a particular condition. Further, the trial judge's decision to accept as more credible medical testimony favoring a disability finding versus that tending to disprove such and his resulting findings of fact are entitled to great weight on appeal.
In arguing that the WCJ erred, Defendants point to a report of Dr. Cobb suggesting that Ms. Stelly can perform light duty and Dr. Gidman's approval of the modified job position as within her capabilities. In a report of April 11, 2001, Dr. Cobb reiterated his recommendation for surgery, then continued: "I would think, if she is unable to have the surgery, that perhaps she can function at a light work category with some restrictions regarding her back and leg."
The WCJ focused on the word "perhaps" in Dr. Cobb's report, finding that it did not amount to an unconditional release, particularly when considered with Dr. Cobb's longstanding belief that surgery was necessary. We also note that Dr. Cobb would later issue three slips stating that Ms. Stelly was disabled pending treatment. As to the modified position, the WCJ apparently accepted Ms. Stelly's testimony that she could not be on her feet all day and that she could not perform certain aspects of patient care unassisted. Citing a medical report that Ms. Stelly should not be placed in a position where she had to exert "maximum effort," the WCJ concluded that Ms. Stelly would be unable to perform the modified position, as it did not specify that someone would assist her in handling the varying needs of patients. The WCJ also relied on the objective results from the EMG and MRI that Drs. Cobb, Hodges, and Broussard considered to be consistent with her complaints, noting that "[t]he only physician out of the group who seems to think that the L-5/S-1 disk bulge or protrusion is insignificant is Dr. Gidman." We also point out that Dr. Heitkamp recommended that Ms. Stelly use crutches pending surgery and that Dr. Hodges recommended the use of a cane. Based upon this record, we find no error in the award of temporary total disability benefits.

Surgery
Defendants next argue that the WCJ erred in ordering the surgery recommended by Dr. Cobb, given that the court-appointed expert, Dr. Broussard, testified that he would not personally perform surgery on Ms. Stelly and that Dr. Gidman was adamant in his opinion that surgery would likely "hurt" rather than help her.
Although Dr. Broussard said that he would personally decline performing surgery on this patient, he further stated:
There is not doubt in my mind that more aggressive surgeons would perform surgery on this patient based on her chronic pain, based on the findings of the MRI, and based on the electrical diagnostic studies and certainly an argument can be made for that. If the patient and her physicians were willing to undertake the risk of surgery based on those findings, which are documented in the records, then I certainly would not stand in the way of such.

(Emphasis added.)
Dr. Cobb and Dr. Hodges had repeatedly recommended surgery throughout their treatment of Ms. Stelly. Dr. Hodges, who saw her the most times, expressed concern that the delay in treatment would result in additional nerve damage, which would persist even with surgery. Assuming that she would be having "probable surgery for her herniated disc with marked [r]adiculitis," Dr. Heitkamp opined that "crutches would be beneficial until she has her surgery." Although Dr. Broussard did not personally *967 agree with Drs. Cobb and Hodges, he recognized the reasonableness of their position. In contrast to Dr. Gidman, who stated that the MRI did not demonstrate any pathology to indicate that Ms. Stelly's symptoms were caused by the L5-S1 disc and who did not believe that she had a radiculitis, Dr. Broussard stated that the L5-S1 disc was "definitely protruding" and was the most likely cause of the radiculitis. Given that Dr. Gidman was the only physician not to acknowledge that Ms. Stelly had a radiculitis, we find no error in the WCJ's rejection of his recommendations.

Penalties and Attorney Fees
In its oral reasons, the WCJ awarded Ms. Stelly $2,000 in penalties and $8,500 in attorney fees for the discontinuance of her indemnity benefits and $2,000 in penalties for the failure to authorize her surgery. The written judgment, however, did not include the penalty award for the discontinuance of benefits.
The discontinuance of benefits is governed by La.R.S. 23:1201.2. Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41. The failure to authorize a medical procedure is governed by La.R.S. 23:1201(F). Authement v. Shappert Eng'g, 02-1631 (La.2/25/03), 840 So.2d 1181. These statutes provide for different remedies and different standards of conduct.
Under Section 1201.2, only attorney fees are recoverable for the discontinuance of benefits when that action is found to be "arbitrary, capricious, or without probable cause." "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." Brown v. Texas-LA Cartage, 98-1063, pp. 8-9 (La.12/1/98), 721 So.2d 885, 890. Under Section 1201(F), both penalties and attorney fees may be awarded for the failure to provide timely payment of benefits or medical expenses, unless, as provided in Section 1201(F)(2), the claim is "reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." "Depending on the circumstances, a failure to authorize treatment is effectively a failure to furnish treatment" that can result in the imposition of penalties and attorney fees. Authement, 840 So.2d at 1187. "[I]n order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits." Brown, 721 So.2d at 890.
The decision to award penalties and attorney fees is a factual determination that will not be reversed on appeal absent a finding of manifest error. Colonial Nursing Home v. Bradford, 02-588 (La.App. 3 Cir. 12/30/02), 834 So.2d 1262, writ denied, 03-364 (La.4/21/03), 841 So.2d 802.
In penalizing Defendants for both the discontinuance of benefits and the refusal to authorize surgery, the WCJ expressed concern that Defendants relied upon Dr. Gidman's refusal to attach any significance to the positive findings of the MRI and EMG, whereas all the other doctors, including the court-appointed expert, agreed that those tests provided objective corroboration for Ms. Stelly's claim of an injured disc with radiculitis. Commenting on the "great delay" in their refusal to authorize surgery, the WCJ concluded that they made "every attempt ... with Doctor Gidman to cut off the recommendation of Doctor Cobb for surgery," even when the tests recommended by the various doctors yielded positive results that confirmed her problem. The WCJ also concluded that Dr. Broussard's testimony demonstrated the reasonableness of Dr. Cobb's position. *968 Upon review of the record, we find no error in the WCJ's characterization of the evidence and in his conclusions of fact.
Accordingly, the awards for penalties and attorney fees as they appear in the written judgment are affirmed. Ms. Stelly's request that we reinstate the penalty for discontinuance of benefits is denied, as penalties are clearly not recoverable under La.R.S. 23:1201.2.

Duration of Disability, Future Medical Expenses, and Legal Interest
Defendants next ask that we correct the judgment in three respects. They first argue that the judgment provides for an improper duration of disability, as it orders weekly benefits to continue "as long as the plaintiff is determined to be disabled." They also contend its award of "all related medical expenses during plaintiff's disability" amounts to an improper award of future medical expenses. Finally, they point out that the judgment awards interest on penalties and attorney fees from the date of judicial demand rather than from the date of the award.
Louisiana Revised Statutes 23:1221(1)(d) provides that an award of temporary total disability benefits shall cease "when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required." We hereby amend the judgment to conform to this statute.
Under La.R.S. 23:1203(A), an employer is obligated to furnish an employee who has a compensable claim "all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal." As we explained in Jacquet v. Southern Structures, Inc., 97-1696, p. 8 (La.App. 3 Cir. 5/20/98), 713 So.2d 723, 728 (emphasis added), "An award of compensation benefits for future medical expenses is separate and distinct from an award of disability benefits. An injured employee's entitlement to benefits for medical expenses exists even if he returns to work, provided he needs further medical treatment for the work-related injury." Thus, the judgment incorrectly awards medical expenses "during plaintiff's disability," as the right to those benefits may extend beyond the period of disability. Although future medical expenses were awarded in Jacquet, the court in Prevost v. Jobbers Oil Transport Co., 95-224, p. 5 (La.App. 1 Cir. 10/6/95), 665 So.2d 400, 404, writ denied, 96-440 (La.4/8/96), 671 So.2d 336, recognized that such an award is unnecessary because "the right to claim such expenses is always reserved to the plaintiff." Accordingly, we affirm the judgment insofar as it recognizes the right to receive surgery and other related medical expenses, but we amend it to delete the phrase "during plaintiff's disability" in conformity with La.R.S. 23:1203(A).
In Sharbono v. Steve Lang & Son Loggers, 97-110, p. 11 (La.7/1/97), 696 So.2d 1382, 1389 (emphasis added), the supreme court held:
Because awards of penalties and attorney's fees are not automatic in the worker's compensation setting, but rather rest within the discretion of the hearing officer, they come due, if at all, only on the date of their award by the officer; thus, such awards may not earn interest until after that date.

In the present case, the WCJ incorrectly awarded interest on penalties and attorney fees from the date of judicial demand. The judgment is hereby amended to reflect *969 that interest on those awards commences from the date of judgment.

Decree
For the above reasons, the judgment of the Office of Workers' Compensation is amended to conform with La.R.S. 23:1221(1)(d) and La.R.S. 23:1203(A) and to award interest on penalties and attorney fees from the date of judgment rather than the date of judicial demand. In all other respects, the written judgment is affirmed. Costs of this appeal are assessed to Defendants, Health South Rehabilitation Hospital and ESIS Insurance Company.
AFFIRMED AS AMENDED.