# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-242

**LEON ROY**

**VERSUS**

**SCHILLING DISTRIBUTING COMPANY, INC., ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF LAFAYETTE, NO. 11-09643
ADAM C. JOHNSON, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

**Janice Hebert Barber**
**Jennifer B. Valois**
**Barber Law Firm**
**111 Mercury Street**
**Lafayette, LA 70503**
**Telephone: (337) 232-9893**
**COUNSEL FOR:**
        **Plaintiff/Appellant - Leon Roy**

**Renee C. Willis**
**Johnson, Rahman & Thomas**
**2237 South Acadian Thruway**
**Baton Rouge, LA 70898-8001**
**Telephone: (225) 231-0557**
**COUNSEL FOR:**
        **Defendants/Appellees - Louisiana Workers' Compensation Corporation and Schilling Distributing Company, Inc.**

**THIBODEAUX, Chief Judge.**

Leon Roy appeals from a judgment of the Office of Workers' Compensation (OWC), finding that the termination of indemnity benefits was proper by the defendants-appellees, employer Schilling Distributing, Inc. and its insurer, Louisiana Workers' Compensation Company (LWCC). For the following reasons, we affirm in part and reverse in part the judgment of the OWC.

## I.

## ISSUES

We must decide:

(1)     whether the OWC was clearly wrong in failing to address the conversion of benefits;

(2)     whether the OWC manifestly erred in finding that supplemental earnings benefits were properly terminated; and

(3)     whether the OWC abused its discretion in denying penalties and attorney fees to the claimant for arbitrary and capricious termination of benefits.

## II.

## FACTS AND PROCEDURAL HISTORY

In June 2010, fifty-three-year-old Leon Roy, a warehouseman who repackaged damaged cases for the defendant beer distributor, sustained a back and neck injury when a rack containing the product fell on him. LWCC began paying temporary total disability benefits (TTDs) immediately. Mr. Roy went to his employer's occupational clinic, then saw orthopedist Dr. John Schutte, who ordered an MRI which revealed a disc bulge at L2-3 and a disc protrusion at L5-

S1. After a steroid injection failed and Mr. Roy developed radiculopathy, Dr. Schutte sent him to neurologist Dr. Ricardo Leoni for evaluation.

In November 2010, Dr. Leoni recommended a microdiscectomy at L5-S1, indicating that Dr. Schutte would be available if a fusion was required.

LWCC approved the surgery, and Dr. Leoni sent Mr. Roy to Med South Cardiovascular Institute of the South for cardiac clearance. Mr. Roy's echocardiogram and nuclear stress test were abnormal. The cardiologist, Dr. Michael McElderry, wanted an angiogram in order to complete his assessment. Dr. McElderry's request to LWCC for an angiogram was denied, and the surgery was cancelled in January 2011.

At the end of March 2011, the nurse/case manager for LWCC, Kimberly Sanders, scheduled a conference with Dr. Leoni without notifying Mr. Roy, who was unrepresented at the time. Via telephone conference, she asked Dr. Leoni what his medical plan would be if Mr. Roy did not have the surgery, whether Mr. Roy was at maximum medical improvement (MMI) and what restrictions there would be without the surgery. Dr. Leoni replied that there was no medical plan if Mr. Roy did not have the needed surgery, that he would be at MMI, and that sedentary duty would be his permanent restriction without the surgery.

LWCC converted Mr. Roy's benefits from TTDs to supplemental earnings benefits (SEBs) on April 2, 2011, paying him monthly instead of weekly.

Buster Fontenot, a vocational rehabilitation counselor, met with Mr. Roy in May. Mr. Roy had obtained counsel, and the meeting took place in his attorney's office.

In July 2011, LWCC again denied authorization for the angiogram, indicating in writing that it was a non-related medical expense. Mr. Roy's attorney

responded with attached case law regarding coverage of the medical testing and explained that Mr. Roy did not have a cardiac condition or cardiac history.

Pursuant to LWCC advice in its correspondence, Mr. Roy went to the charity hospital facility on two occasions and was put on the hospital's list for a non-emergency angiogram. He was never called.

In September 2011, Buster Fontenot submitted ten (10) jobs to Dr. Leoni for his approval. Dr. Leoni answered a verification form, indicating that Mr. Roy had reached MMI, that he *would* require further diagnostic testing or medical treatment, that he was released, and that he could return to some type of employment. In October, 2011, Dr. Leoni approved nine (9) of the ten (10) jobs submitted to him by the vocational counselor. Dr. Leoni had not seen Mr. Roy for eleven months since recommending the surgery in November 2010.

The vocational counselor sent Dr. Leoni's job reviews to Mr. Roy's attorney in late October, 2011.

LWCC terminated Mr. Roy's SEBs as of October 18, 2011, stating that all of the jobs approved by Dr. Leoni paid at least 90% of Mr. Roy's pre-injury wages of $7.55 an hour.

In May of 2012, due to Dr. Leoni's retirement from surgery, Dr. Patrick Juneau, who had provided a second medical opinion (SMO), became Mr. Roy's choice of neurosurgeon. Dr. Juneau agreed with Dr. Leoni's diagnosis and sought surgical clearance by the cardiologist for the microdiscectomy at L5-S1.

In June 2012, LWCC agreed to pay for the diagnostic portion of the angiogram. In August, Dr. Juneau recommended an L5 bilateral decompressive laminectomy with bilateral foraminotomies and a left L5-S1 microdiscectomy, followed by an instrumented fusion at the L5-S1 level.

3

The parties entered into a partial consent judgment in September, wherein LWCC authorized the angiogram and agreed to reinstate Mr. Roy's benefits when he was cleared for surgery. The consent judgment contained a waiver of penalties and attorney fees on the issue of the angiogram.

The issue of termination of benefits, along with any attendant penalties and attorney fees, went to trial in October 2012. The OWC found that one (1) of the ten (10) jobs located by the vocational rehabilitation counselor was suitable and available under the criteria enunciated in *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. It found that Mr. Roy's benefits were properly terminated by LWCC and that no penalties and attorney fees were due.[1]

On appeal, Mr. Roy asserts that the OWC judgment should be reversed. He asserts that he was due TTD benefits from the date of the accident forward; that his benefits were wrongfully converted to SEBs in April 2011; that all benefits were wrongfully terminated in October 2011; and that he is due penalties and attorney fees for the wrongful acts. In the alternative, he asserts that the vocational rehabilitation efforts did not meet the minimum criteria and that SEBs should have continued from the time of termination in October 2011 through the time that benefits were reinstated in December 2012.

---

[1]After trial and after the angiogram, Mr. Roy was reportedly cleared for surgery, and his wage benefits were reportedly reinstated in December 2012.

III.

## STANDARD OF REVIEW

Factual findings in workers' compensation cases are subject to the manifest error/clearly wrong standard of review. *Banks*, 696 So.2d 551. In applying this standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether its conclusion was reasonable. *Id.*

IV.

## LAW AND DISCUSSION

*April 2011 Conversion of Benefits*

Mr. Roy contends that his benefits were wrongfully converted from TTDs[2] to SEBs[3] in April 2011, before the termination of all benefits six months later in October 2011. He asserts that the release by Dr. Leoni was conditional under *Stelly v. Health South Rehabilitation*, 03-171 (La.App. 3 Cir. 7/2/03), 854 960, that he was not released at all by his orthopedist, Dr. Schutte, and that the trial court erred in failing to consider that the benefits at issue were TTDs, not SEBs.

---

[2]Temporary total disability benefits are authorized at 66.66% of an employee's weekly wage "[f]or any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages." La.R.S. 23:1221(1)(a). If the employee is not working, in order to receive TTDs, he must show "by clear and convincing evidence, unaided by any presumption of disability" that he is physically unable to work. La.R.S. 23:1221(1)(c). An award of TTDs "shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required." La.R.S. 23:1221(1)(d).

[3]Supplemental earnings benefits are authorized at 66.66% of the difference between the employee's average monthly pre-injury wage and his average monthly post-injury wage when he is able to work, but unable to earn "wages equal to ninety percent or more of wages at time of injury." La.R.S. 23:1221(3)(a)(i). SEBs are payable monthly. *Id.* "When the employee is entitled to monthly [SEBs] pursuant to this Subsection, but is not receiving any income from employment or self-employment and the employer has not established earning capacity pursuant to R.S. 23:1226, payments of [SEBs] shall be made in the manner provided for in R.S. 23:1201(A)(1)." La.R.S. 23:1221(3)(a)(ii).

The defendants argue that wrongful conversion of benefits was not asserted before trial and, therefore, not properly before the OWC or this court.

The record reveals that the conversion of benefits and the release by Dr. Leoni were not asserted in Mr. Roy's 1008, his amended 1008, or his pre-trial statement; nor was the issue asserted at trial. More specifically, there were thirteen stipulations prior to trial. Stipulation number six stated that without surgery, Dr. Leoni placed Mr. Roy at MMI with sedentary restrictions, though the statement did not include the term "release" as argued by the defendants. However, after the stipulations were read, the OWC next specifically clarified with the parties that the "sole issue" for trial was the termination of benefits after October 18, 2011, and penalties and attorney fees in connection with it. This was in accord with the pretrial statement. Pursuant to the hearing rules promulgated in accordance with La.R.S. 23:1310.1, La.Admin.Code, Title 40, Chapter 62, Subchapter A, § 6201 states that: "Only those issues listed in the pretrial statements shall be litigated at trial. No new issues shall be raised except by written order of the judge for good cause or upon mutual agreement of the parties."

Mr. Roy's attorney raised the issue of conversion of benefits in her post-trial brief, but it was not addressed by the OWC orally or in the judgment. While we have many concerns with Dr. Leoni's release and the manner and time-line in which it was obtained,[4] we cannot find that the OWC was clearly wrong for

---

[4]The defendant's nurse/case manager scheduled a conference with Dr. Leoni on March 31, 2011, while Mr. Roy was waiting for an angiogram so he could have the surgery recommended in November 2010, over four months prior. The nurse scheduled the conference without notice to Mr. Roy, who did not have an attorney. She asked Dr. Leoni, and she reported, only specific questions such as a "would be" MMI status and "would be" restrictions, without the surgery. Mr. Roy's TTD benefits were converted two days later on April 2, even before Dr. Leoni's written confirmation of the phone conversation. A week later, Mr. Roy hired an attorney, who informed the defendant of the requirement for vocational rehabilitation services if SEBs were instituted, but pointed out the road block of Mr. Roy's having to truthfully answer a 1208

6

failing to consider an issue that was not raised and argued at trial after he specifically asked what the issues were in advance, just "to make clear" for the record and for his decision-making process. Had the workers' compensation judge decided to address the issue based upon the post-trial brief and the evidence presented during trial, he, or we, could have invoked La.R.S. 23:1317, which provides in part that the workers' compensation judge "shall not be bound by technical rules of evidence or procedure" when the evidence is competent and objective. La.R.S. 23:1317(A). *See Douglas v. Grey Wolf Drilling Co.*, 03-515 (La.App. 3 Cir. 11/5/03), 858 So.2d 834. Under the present facts, however, we find no manifest error on the part of the workers' compensation judge in not addressing the issue of the April 2011 conversion of benefits.

*Termination of All Benefits as of October 18, 2011*

Mr. Roy contends that the OWC manifestly erred in finding that his benefits were properly terminated as of October 18, 2011, based upon the vocational rehabilitation results of counselor Buster Fontenot. We agree. Fontenot located ten jobs which he sent to Dr. Leoni for approval. Dr. Leoni signed off on nine of the jobs, which included customer service representative for a tractor supply company, cashier at Murphy USA, custodian at McDonalds, which Fontenot withdrew at trial, airport car transporter for Hertz Rent A Car, Pop-A-Lock technician, U-Haul customer service representative, service writer at an

---

questionnaire, thereby revealing to a potential employer that he was waiting for surgery recommended by two neurosurgeons. The vocational rehabilitation meeting did not occur until May 26, 2011. The term "release" did not appear until September 2011, when Dr. Leoni simultaneously answered "yes" to the necessity for further medical testing or treatment, and "yes" to a release, though he had not seen Mr. Roy since the prior November. Perhaps because Mr. Roy's SEB payments were the near equivalent of his previous TTD benefits, and perhaps because the termination of all benefits occurred after he filed suit in October 2011, the issue of the conversion was lost to the overriding issue of termination.

automobile repair department, hospital courier, and customer service/lawn and garden position at Lowe's in Crowley. The only job not approved by Dr. Leoni was go-cart technician at Gatti Town Family Fun Center.

Of these nine positions, the trial court eliminated eight, finding that three were filled when submitted to Mr. Roy, one was pulled by Fontenot at trial, two did not satisfy *Banks*, 696 So.2d 551, because they required lifting fifty pounds, one was not suitable because it required a high school diploma or the equivalent, and one failed because of insufficient evidence of availability. The only job found appropriate by the OWC was the Lowe's job in Crowley. The workers' compensation judge opined that the Lowe's job met the defendants' burden of proof under the *Banks* criteria[5] where it paid a minimum of $7.50 an hour; it was located in Crowley, while Mr. Roy lived in Carencro; the doctor's approval of the job was evidence that Mr. Roy was physically capable of performing it; it fell within Mr. Roy's age, experience, and education; and Mr. Fontenot testified that it was still available on October 25, 2011, when he sent notification to Mr. Roy's attorney.

---

[5]The Louisiana Supreme Court in *Banks*, 696 So.2d 551, concluded that an employer could discharge its burden of proving job availability by establishing, at a minimum and by competent evidence:

> (1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
>
> (2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
>
> (3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.

*Banks*, 696 So.2d at 557-58. The court explained that "suitable job" meant one that the claimant could physically perform *and* one that fell within the limits of his age, experience, and education. *Id*. at 558.

8

We find that the record does not reflect a reasonable basis for the OWC's finding in favor of the defendant on the criteria of physical capability and availability. More specifically, the OWC relied on Dr. Leoni's approval of the Lowe's job as proof of Mr. Roy's physical ability. However, Dr. Leoni also approved two jobs that the OWC ruled out because they required lifting of fifty pounds. The Lowe's job description, prepared by Fontenot, who admittedly creates all percentages in his descriptors, stated that the job required the employee to frequently (meaning 34-66% of the time) stand, walk, reach, push, pull, "handle," and to lift and carry up to twenty pounds. The job duties included assisting customers in "carrying and loading purchases," pushing carts, cleaning outside, organizing, watering, and arranging plants for display. The "Physical Demand Level" of the Lowe's job was "Light," as was the duty level of all ten jobs located by Fontenot; however, "Light" was also the description of Mr. Roy's job at Schilling, the one he was disabled from resuming.

Dr. Leoni clearly gave Mr. Roy "sedentary" restrictions. He opined in 2010 that Mr. Roy had a ten percent disability rating with or without surgery, before his condition worsened bilaterally and a fusion was required. In September of 2010, Dr. Leoni reported that Mr. Fontenot had pain all across his lower back, down the right leg and into the top of the foot. He could not walk without pain. Sitting and standing also increased the pain. Neither physical therapy nor injections had helped. Dr. McElderry reported that he could not put Mr. Roy on a treadmill because he could not walk. Fontenot admitted at trial that he did not even look for sedentary positions for Mr. Roy.

Fontenot's universal and somewhat cavalier response to questions about the categories and job descriptions, including information in his licensing

manual, was that he did not trust them, that most jobs these days were light duty because equipment and other employees were available to assist every other employee. At the same time, he admitted that a nurse at one hospital will work extremely hard, while one at another hospital will have an easy job. He also stated that he himself got fat working on an off-shore oil rig. His reasoning was inconsistent, and his answers were non-specific, often evasive, and non-responsive to the questions asked. He testified that his "job developers" sent him many of the jobs and that he had provided Mr. Roy's attorney with his entire file, omitting nothing. Yet he had no documentation from the job developers, no knowledge of who they talked to in getting their information, no dates on any of the job descriptions, and no time sheets, which he later said were in the possession of his wife, who did his billing.

Fontenot did not know whether Mr. Roy had a good driving record or a GED. He did not know where Mr. Roy lived, though he had been there for forty years; or whether he could operate a forklift, run a cash register, which was required by Lowe's and most of the jobs, or operate a computer. Fontenot testified that anyone can learn a cash register in five or ten minutes, and anyone who can use a smart phone can operate a computer; but he admitted to not knowing whether Mr. Roy had a computer or a smart phone. Mr. Roy did not have a computer. Prior to working for the defendant, Mr. Roy had basically washed cars, run errands, and performed lawn maintenance at Hub City Ford for eighteen years.

With regard to the availability of the Lowe's job, Fontenot testified that his wife had dragged him to Lowe's the night before he sent the jobs to Dr. Leoni on September 15, 2011, and that he personally saw the job on the bulletin board and looked it up on the store's computer. Later, when specifically asked

10

about follow-up, he responded that it was "policy" to follow up within two days of sending the jobs to the doctor and again when receiving the doctor's response. He admitted, however, that he had no documentation on availability or follow-up. The defendant's own attorney then asked him if he had any recollection or information to indicate whether any of the jobs were still available on October 25, 2011, after Dr. Leoni signed off on them and they were sent to Mr. Roy's attorney.

Fontenot responded: "Okay. The Lowe's, I know was available because, again, I checked on the – the bulletin board and the computer." He did not mention whether his wife had fortuitously dragged him to Lowe's again on October 24 to do his follow-up on the bulletin board in the exact way he had discovered the job over a month earlier in September. The record does not reflect a reasonable basis for finding that Fontenot's testimony on availability qualified as competent evidence.

Additionally, the $7.50 per hour wage at Lowe's was described by Fontenot as "DOE," an acronym which means "depending on experience," which is speculative under *Banks.* Accordingly, we reverse the OWC judgment in favor of the defendants' termination of benefits on October 18, 2011, and order that they be re-instated as of that date.

*Penalties and Attorney Fees*

Mr. Roy contends that he is entitled to penalties and attorney fees for the below-minimum vocational rehabilitation services resulting in the arbitrary and capricious reduction and then termination of Mr. Roy's benefits.

The applicable statute in this case is La.R.S. 23:1201(I), which governs the discontinuation of benefits on October 18, 2011, and which provides

11

for attorney fees and penalties if the termination is found to be arbitrary, capricious, or without probable cause. "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." *Brown v. Texas-LA Cartage*, 98-1063, pp. 8-9 (La. 12/1/98), 721 So.2d 885, 890 (citing BLACK'S LAW DICTIONARY 104, 211 (6th ed. 1990)).

Here the termination of benefits was based upon the vocational rehabilitation efforts and results of counselor Fontenot, who met with Mr. Roy on one occasion, did no skills testing, and apparently never called to follow up.

Fontenot did, however, give Mr. Roy an occupational preference questionnaire and work application log to complete, in order to gauge what kind of work Mr. Roy leaned toward, and he did write a couple of follow-up letters regarding these forms. Mr. Roy, who was still waiting for surgery, and who had never been told that Schilling was not taking him back, just kept waiting. His elderly mother was also in the hospital with cancer; and he did not send in the requested forms. Fontenot, therefore, went through some of the motions and based his results upon Dr. Leoni's inattentive release and job approvals.

In conclusion, we find that the questionable vocational efforts were far less than laudable under the standards enunciated in *Banks*, 696 So.2d 551, *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52 (La.1993), *Livings v. Langston Companies, Inc./Continental Bag Div.*, 96-636 (La.App. 3 Cir. 12/5/96), 685 So.2d 405, and *Maxie v. Brown Industries, Inc.*, 95-19 (La.App. 3 Cir. 5/31/95), 657 So.2d 443, *writ denied*, 95-1630 (La. 10/6/95), 661 So.2d 469. The communication efforts, attention to medical records and details, testing, and follow-up were minimal, and sometimes missing altogether. We are reluctant,

however, to find that the conduct was arbitrary and capricious under La.R.S. 23:1201(I) and the current set of facts. Accordingly, we affirm the denial of penalties and attorney fees.

V.

## CONCLUSION

Based upon the foregoing, we find no manifest error in the OWC's failure to address the conversion of benefits in April 2011; we reverse the judgment as to termination of benefits and order the defendants to reinstate Mr. Roy's SEBs as of the date of termination, October 18, 2011; and we affirm the denial of penalties and attorney fees.

All costs are assessed to Schilling Distributing Company, Inc.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

13