# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**09-1219**

GLORIA CLAY

VERSUS

**OUR LADY OF LOURDES REGIONAL MEDICAL CENTER, INC.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF LAFAYETTE, NO. 06-03500
SHARON MORROW, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and J. David Painter, Judges.

**REVERSED AND RENDERED.**

**Philip E. Roberts
Leake & Anderson, L.L.C.
P. O. Drawer Z
Lafayette, LA 70502
Telephone: (337) 233-7430
COUNSEL FOR:**
**Defendant/Appellee - Our Lady of Lourdes Regional Medical Center, Inc.**

**Michael Benny Miller
Miller & Miller
P. O. Drawer 1630
Crowley, LA 70527-1630
Telephone: (337) 785-9500
COUNSEL FOR:**
**Plaintiff/Appellant - Gloria Clay**

**THIBODEAUX, Chief Judge.**

The claimant/appellant, Gloria Clay, brought a workers' compensation claim against her employer, defendant/appellee, Our Lady of Lourdes Regional Medical Center, Inc. (Lourdes), for injury to her back while lifting solution supplies. A rehabilitation counselor provided information regarding potential employers. When Ms. Clay applied for but did not obtain employment, the OWC terminated her benefits after applying a credit in favor of Lourdes for the wages that Ms. Clay would have earned had she been employed by a particular employer. Ms. Clay appeals the termination of her benefits and the calculation of her average weekly wage (AWW) after the inclusion of fringe benefits.

Where Ms. Clay attempted to obtain all positions suggested, we find that employment was unavailable to Ms. Clay and that the OWC applied an overly restrictive interpretation of the applicable law in terminating her benefits. We, therefore, reverse the judgment terminating Ms. Clay's benefits. We further find a misapplication of the statutory and jurisprudential provisions for calculating a claimant's AWW and reverse the OWC judgment on that issue as well.

I.

ISSUES

We must decide:

(1) whether the OWC erred in terminating Ms. Clay's workers' compensation benefits; and,

(2) whether the OWC erred in calculating Ms. Clay's average weekly wage and fringe benefits.

## II.

## FACTS AND PROCEDURAL HISTORY

On June 28, 2005, Gloria Clay, who had been employed with Lourdes for a total of twenty-two years, sustained a back injury while lifting and pulling heavy solution bags from twenty carts. She began to have spasms in her upper back on the first day, and by the end of the second day, June 29, the pain went down her back and into her left leg. The injury caused Ms. Clay pressure in her back, a ten (10) on the pain scale, with burning, pulling sensations in her left buttock worsened by sitting, standing, and walking.

Ms. Clay was treated with medication, physical therapy, and a lumbar epidural steroid injection. When this worsened her pain, she was referred to a neurosurgeon, Dr. Bertuccini, who diagnosed symptomatic spinal stenosis at L4-5. He opined that injury can cause this degenerative condition to become symptomatic and recommended lumbar decompression surgery at the initial visit in December of 2005. Lourdes did not authorize payment for the prescriptions and surgery recommended by Dr. Bertuccini until May of 2007.

Lourdes obtained an order compelling vocational rehabilitation in February of 2008. A vocational rehabilitation counselor provided information regarding jobs that were ostensibly available to Ms. Clay. She applied for all of the jobs suggested, including those at a medical facility, but was unable to obtain employment. Ms. Clay received at least two rejection letters based upon her unmatched skills and qualifications. Lourdes did not offer Ms. Clay a position similar to either of the hospital positions recommended by the vocational counselor.

The OWC found that a recommended job at Stuller Settings was available to Ms. Clay in August of 2008, even though Ms. Clay had received a

rejection letter from Stuller. The OWC further found that actual job placement was not a requirement for proof of availability of employment. Lourdes terminated Ms. Clay's benefits in December of 2008 pursuant to the OWC ruling at trial during that same month.

The OWC issued a judgment finding that Ms. Clay was entitled to weekly wage benefits of $252.03, based upon an AWW of $378.05, from December 28, 2005 through August 25, 2008, subject to a credit for wage benefits already paid. The judgment awarded Ms. Clay $8,000.00 in penalties for four failures by Lourdes to timely pay medical related benefits, as well as attorney fees in the amount of $10,000.00.

Ms. Clay appealed the judgment on the issues of termination of benefits and the calculations of average weekly wages and fringe benefits. Lourdes answered the appeal and listed errors for review, but failed to file its brief. Issues not briefed are deemed abandoned. *See Uniform Rules—Courts of Appeal, Rule 2-12.4.*

We find that the OWC applied an overly restrictive interpretation of *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551, resulting in a termination of benefits in this case. Therefore, we reverse the OWC judgment on the issue of termination of benefits, reinstating Ms. Clay's benefits from the date of termination, August 25, 2008, forward. We further reverse the OWC on its calculation of Ms. Clay's AWW and fringe benefits due to incorrect methodology and misinterpretation of the applicable law. We increase the award of attorney fees by $5,000.00 for work done by Ms. Clay's attorney on appeal.

## III.

## LAW AND DISCUSSION

### Standard of Review

When an appellate court finds that a reversible error of law was made in the lower court, it must conduct a de novo review of the entire record and render a judgment on the merits. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

### Termination of Benefits

Ms. Clay contends that the OWC erred in terminating her benefits. We agree. The workers' compensation judge stated at trial that the vocational rehabilitation counselor, Ms. Montero, "attempted jobs that were suitable" and that under *Banks*, 696 So.2d 551, actual "job placement is not required." Counsel for Ms. Clay argues that the positions were not suitable and that, since Ms. Clay applied for all positions submitted and was turned down in every case, those jobs were not available to her under La.R.S. 23:1221(3)(c)(i).

The record reveals that Ms. Clay was a fifty-six-year-old widow with three grown daughters when she met with the vocational rehabilitation counselor for the first time on March 31, 2008. She had graduated from high school in 1971 but had had no additional schooling. Ms. Clay had worked for Lourdes as a supply, purchasing, and distribution clerk from 1975 to 1986 and again from 1995 until the time of her injury in June 2005. In the nine-year interim between her two periods of employment with Lourdes, Ms. Clay had taken care of her grandmother. Her only other employment was a two-month temporary position making pies for a bakery. At Lourdes, she stocked shelves and pulled and delivered medical supplies, occasionally entering patient charges onto a form in a computer. Ms. Clay did not own a computer and denied computer literacy. Her rate of pay with Lourdes was $9.95 per hour.

4

Ms. Clay argues that she met her burden of proving that she could not earn ninety percent (90%) of her pre-injury wages because she could no longer stock medical supplies and because none of the clerical jobs submitted were available to her wherein she had applied but was turned down for each one. She correctly argues that under La.R.S. 23:1221(3)(c)(i), the burden then shifted to Lourdes to prove that the jobs were available. More specifically, La.R.S. 23:1221(3)(c)(i) (emphasis added) provides in pertinent part that supplemental earnings benefits shall be paid:

> [I]f the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is *able to earn* in any month shall in no case be less than the sum the employee *would have earned in any employment* or self-employment, as described in Subparagraph (b) of this Paragraph, *which he was physically able* to perform, *and* (1) which he *was offered* or tendered by the employer or any other employer, *or* (2) which is *proven available to the employee in the* employee's or employer's *community or reasonable geographic region.*

Accordingly, as Ms. Clay argues, the clear language of the statute requires that the jobs be "proven available to the employee."

In *Banks*, upon which the OWC relied for the proposition that actual job placement is not necessary, the primary issue was the employer's proof of availability, and the holding in that case squares off directly in favor of Ms. Clay, particularly in view of the court's explanation of suitability. In *Banks*, the Louisiana Supreme Court reversed the Second Circuit Court of Appeal and reinstated the OWC's finding that the employer had failed to demonstrate that jobs were available to the claimant. Banks had been a roofer's helper when a bundle of shingles fell on his right hand, dislocating and fracturing his right thumb, requiring an open reduction and internal fixation, and a repair of ligament structures the day after the accident.

5

Similar to the facts in this case, the vocational rehabilitation counselor in *Banks* completed an initial evaluation and performed a transferrable skills analysis. Banks was a forty-four (44) year-old high school graduate who had been an orderly, a cook, and a baker's helper prior to his employment with Industrial Roofing as a roofer's helper. It was undisputed that Banks was partially disabled and unable to return to his pre-injury employment as a roofer's helper. Where Banks had proved partial disability, the question before the court was whether the employer had carried its burden of proving that there were jobs available to Banks within his physical capabilities that would pay him ninety percent (90%) or more of his pre-injury wage. In discussing job availability, the court resolved conflicts in the courts of appeal by concluding that an employer could discharge its burden of proving job availability by establishing, at a minimum:

> (1) the existence of a *suitable job* within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
>
> (2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
>
> [(]3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.

*Banks,* 696 So.2d at 557 (emphasis added).

In *Banks*, the claimant's post-injury limitations were no gripping or pinching and no lifting over fifteen (15) pounds. The rehabilitation counselor identified five jobs for Banks: (1) tractor-trailer driver; (2) unarmed security guard; (3) pest control trainee; (4) cab driver; and, (5) dispatcher. The OWC in *Banks* determined that the cab driver position was outside the limitations assigned to Banks as it required him to lift fifty pounds. As to the remaining jobs, the OWC found that

6

there was insufficient evidence regarding each job's qualifications and physical requirements, wages, and actual openings on the date the jobs were made known to Banks, to determine whether the jobs were within Banks' capabilities. The Louisiana Supreme Court upheld the judgment of the OWC.

In the present case, Dr. Bertuccini released Ms. Clay to light duty work in October 2007, following her surgery five months earlier in May. He deferred to her pain management physician, Dr. Jindia, for approval of jobs submitted by the vocational rehabilitation counselor. Dr. Jindia was still treating Ms. Clay in August of 2008, with medication and injections, for chronic low back and left leg pain, weakness in the lower extremity, and post lumbar laminectomy pain syndrome with left lumbar radiculitis. He opined that she could physically do clerical work as long as she could alternate sitting, standing, and walking, with minimal lifting and bending of her back.

The vocational counselor, Ms. Montero, reported that Ms. Clay's transferrable skills included "Writing – Communicating effectively with others in writing as indicated by the needs of the audience," though there was no evidence in the record that Ms. Clay had, or used, writing skills in her employment. Another skill assigned to Ms. Clay was "Reading comprehension – Understanding written sentences and paragraphs in work related documents," though there was no evidence that Ms. Clay worked with correspondence in her employment. Ms. Montero further reported that alternate job types for Ms. Clay included general office clerk, library clerk, insurance claims clerk, and medical records clerk. Ms. Montero located mostly clerical positions with duties outside of Ms. Clay's experience and training. Ms. Montero admitted at the hearing that Ms. Clay had applied for all of the positions submitted.

7

Ms. Montero located four positions for Ms. Clay that were approved by Dr. Jindia. These included two positions at Medical Center of Southwest Louisiana: (1) Administrative Assistant - Human Resources Department (to assist department with credentialing of medical personnel); and (2) Service Coordinator (to provide clerical support for engineering programs, answer phone, and maintain files). Ms. Clay applied for but was unable to obtain either of these positions. Two other approved positions were (3) front desk receptionist with Norman Dykes, M.D. The duties at Dr. Dykes' office included maintaining an appointment book, and preparing bills and insurance forms. Ms. Clay received a letter of rejection from Dr. Dykes' office stating that they had "chosen to pursue other candidates whose skills, background, and education more closely match our needs." The fourth approved position was a telephone consultant position with Stuller Settings, processing jewelry merchandise orders by phone. It provided thirty to forty hours of work per week. Ms. Clay applied for this position and was rejected by a letter stating that, "we have identified a candidate who more closely matches our requirements."

Therefore, in this case, we have the issue of suitability of the positions suggested to Ms. Clay, who applied for all of them and was rejected. In fact, Ms. Clay testified that she had applied for positions at Bait House, Holiday Inn South, Maison de Lafayette, Bravo Physical Therapy, and she had applied twice at Stuller Settings, eleven positions in all, and was turned down for each and every one.

Suitability is a function of availability. It appears in the first of the three criteria set forth above by the Supreme Court in *Banks*. More specifically, after stating the three minimum requirements for establishing availability, the first of which is a suitable job within the claimant's physical capabilities, the court articulated as follows:

By "suitable job," we mean a job that claimant is not only physically capable of performing, but *one that also falls within the limits of claimant's age, experience, and education*, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education. (FN3)

> (FN3.) We are cognizant that LSA-RS 23:1221(3)(a) provides that an employee's post-injury earning capacity is to be determined by what "the employee is able to earn in any . . . employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience . . . ." Our consideration of an employee's "age, experience, and education" is ***not*** to ensure that an employee is "particularly suited" for a given post-injury job, but, rather, to ensure that the employee is ***capable*** of performing the job. For example, suppose that an employee had been engaged in heavy manual labor prior to his injury, but is now limited to light duty labor as a result of a work-related injury. Suppose also that the employee is illiterate. Under these circumstances, the mere fact that the employee would be physically able to perform secretarial duties does not mean that that job would be suitable for that employee.
>
> We interpret the above-quoted language in LSA-RS 23:1221(3)(a) to mean only that an employee cannot discount a job, for the purpose of calculating post-injury earning capacity, that falls within the limits of his physical capabilities, age, experience, and education simply because he is not "particularly suited" for the job. For example, suppose that the hypothetical employee had a college education. He could not protest the suitability of a job that required only a high school education by asserting that the proposed job was ***beneath*** his capabilities.

*Banks*, 696 So.2d at 557, n.3 560 (emphasis added).

9

In this case, Ms. Clay's experience was essentially as a physical laborer stocking and distributing supplies and equipment, with no office experience and almost non-existent computer skills. Her only job experience outside Lourdes was baking pies. Based upon the foregoing, we find that the positions submitted to and applied for by Ms. Clay were not suitable for her and were, therefore, unavailable to her under La.R.S. 23:1221 and under *Banks*.

**Calculation of Actual Average Weekly Wage**

It is undisputed that Ms. Clay was a forty-hour-per-week, full time, hourly employee, paid bi-weekly, in twenty-six checks per year. Her pay rate with Lourdes was $9.25 per hour. The OWC calculated Ms. Clay's AWW at $378.05 based upon two check stubs indicating wages paid to her by Lourdes for the four weeks preceding her injury on June 28, 2005. The gross earnings on the check stub for the two-week period ending June 25, 2005, was $772.19, and the gross earnings on the check stub for the two-week period ending June 11, 2005, was $740.00. According to the OWC calculation, $772.19 plus $740.00 equals $1,512.19, which, divided by two, results in an AWW of $378.05. The OWC declined to consider Ms. Clay's fringe benefits, or a bonus that she earned during the applicable period, in calculating the AWW. While the OWC was correct in rejecting an AWW based upon twenty six weeks of fringe benefits, as argued by counsel for Ms. Clay, the OWC's calculations and methodology are incorrect, as are those of counsel for Ms. Clay, who arrived at an AWW of $430.49.

We find that Ms. Clay's AWW was $416.71, which is the sum of her actual or baseline wage of $370.00 ($9.25 x 40) plus averaged weekly fringe benefits of $27.75 for paid time off (PTO) and $11.56 for extended illness time (EIT), plus a bonus averaged at $7.40 per week. The method for calculating the actual wages of

10

$370.00 is located at La.R.S. 23:1021(12)(a)(i), while the formula for calculating the bonus is located at subsection (12)(d), and the provision applicable to fringe benefits is subsection (12)(f).

With regard to Ms. Clay's baseline or actual wage of $370.00, La.R.S. 23:1021(12)(a)(i) provides as follows (emphasis added):

> (12) "Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as:
>
> (a) **Hourly wages**.
>
> (i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the *average actual hours* worked in the *four full weeks* preceding the date of the accident or *forty hours*, *whichever is greater*. . . .

Accordingly, if a full-time, forty-hour employee actually works less than forty hours per week in the four full weeks prior to her accident, she is entitled to the "greater" presumption of forty hours per week. While it is true that Ms. Clay used paid time off, or vacation time, during the four full weeks preceding the injury, such that she did not actually work forty hours per week during that period, because she is a full-time employee, she is entitled to the presumption of having worked forty hours under La.R.S. 23:1021(12)(a)(i). Therefore, Ms. Clay's AWW is $370.00 ($9.25 x 40).[1]

_____

[1] We have considered the holdings in *Doucet v. Crowley Manufacturing*, 96-1638 (La.App. 3 Cir. 4/30/97), 693 So.2d 328, *vacated on other grounds*, 97-1438 (La. 9/19/97), 701 So.2d 143, and *Transportation Insurance Co. v. Pool*, 30,250 (La.App. 2 Cir. 5/13/98), 714 So.2d 153, *writs denied*, 98-1566, 98-1616 (La. 9/25/98), 725 So.2d 486, 488, where the courts did not use vacation weeks to calculate the AWW, using the logic that "four full weeks" meant four weeks with no absences. However, reaching back to capture non-vacation weeks is an unnecessary step where the employee is a forty-hour, full time employee who gets the presumption under 12(a)(i) of a forty-hour work week in calculating his or her AWW. Moreover, we believe that the term "four *full* weeks" means using a normal, full-week pay period, such as Monday through Friday, rather than starting the calculation, say, in mid-week on the day before the accident; and it does not mean that you have to use non-vacation weeks if the employee is a full time, forty-hour employee.

**Fringe Benefits**

With regard to the use of fringe benefits in calculating a claimant's AWW, we have held as follows:

> [T]he inclusion of fringe benefits into the calculation of AWW is a very well and long established rule, dictated by an explicit mandate of La.R.S. 23:1021(12)(f) and decades of our jurisprudence. *See e.g. Sterling v. Asplundh Tree Expert Co.*, 03-266 (La.App. 3 Cir. 10/1/03), 856 So.2d 125, *writ denied*, 03-3017 (La. 1/30/04), 865 So.2d 79; *Batiste v. Capitol Home Health*, 96-799 (La.App. 3 Cir. 5/7/97), 699 So.2d 395; *Morgan v. Equitable Gen. Ins. Co.*, 383 So.2d 1067 (La.App. 3 Cir. 1980); *Ardoin v. S. Farm Bureau Cas. Ins. Co.*, 134 So.2d 323 (La.App. 3 Cir. 1961); *Richmond v. Weiss & Goldring, Inc.*, 124 So.2d 601 (La.App. 3 Cir. 1960).

*Cotton v. First Fleet*, 08-1363, p. 7 (La.App. 3 Cir. 4/1/09), 7 So.3d 155, 159, *writ denied*, 09-978 (La. 6/19/09), 10 So.3d 741.

In fact, so settled is this area of the law that we have affirmed penalties against an employer who deliberately chose to remain ignorant of the law with respect to the valuation of fringe benefits in the calculation of an injured worker's wage rate. *See Johnson v. Louisiana Container Co.*, 02-382 (La.App. 3 Cir. 10/2/02), 834 So.2d 1052, 1067, *writ denied*, 02-3099 (La. 5/9/03), 843 So.2d 394.

The Louisiana Supreme Court has stated:

> In determining the amount of pre-injury wages an employee earned, "[a]ny money paid the employee which can be regarded as remuneration or reward for his services should be included in fixing his compensation, irrespective of whether or not the payment was in the form of wages." Malone and Johnson, 14 *Louisiana Civil Law Treatise, Workers' Compensation* § 324 at 93 (1980).

*Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1007-08 (La.1989).

In *Sterling*, 856 So.2d 125, we affirmed the OWC's inclusion of fringe benefits, ten days of vacation and five days of holiday pay, when calculating the claimant's AWW. We cited the essentially identical predecessor of La.R.S.

23:1021(12)(f), which was La.R.S. 23:1021(10)(f), effective on August 15, 1999, for the proposition that fringe benefits are taxable and therefore includable in the AWW. The current version, La.R.S. 23:1021(12)(f) provides as follows (emphasis added):

> (f) **Income tax**. In the determination of "wages" and the average weekly wage at the time of the accident, *no amount* shall be included for any benefit or form of compensation which is *not taxable* to an employee for federal income tax purposes; however, *any amount withheld* by the employer *to fund any nontaxable or tax-deferred benefit* provided by the employer and which was elected by the employee in lieu of taxable earnings *shall be included* in the calculation of the employee's wage and average weekly wage *including* but not limited to any amount *withheld* by the employer to fund any *health insurance benefit* provided by the employer and which was elected by the employee in lieu of taxable earnings shall be included in the calculation of the employee's wage and average weekly wage.

In *Sterling*, we stated that the issue regarding the inclusion of paid holiday and vacation time was whether those forms of compensation were taxable or not. We went on to hold that:

> Any fringe benefit that an employer provides is taxable and must be included in the recipient's pay unless that fringe benefit is specifically excluded by the law. EMPLOYER'S TAX GUIDE TO FRINGE BENEFITS PUB. 15-B (Dept. of the Treasury, Internal Rev. Serv., Jan. 2003).

*Sterling*, 856 So.2d at 130.

We then listed excluded fringe benefits such as meals, stock options, group term life insurance, and other specifically excluded benefits. Since the fringe benefits of vacation and holiday pay in *Sterling* were not excluded by law, they were included in the AWW calculation. Likewise, in *Burns v. St. Francis Cabrini Hospital*, 02-518 (La.App. 3 Cir. 10/30/02), 830 So.2d 572, we held that PTO, sick leave, holiday pay, and vacation pay were rewards to hourly employees for services

13

to the hospital and were properly included in the calculation of the claimant's AWW pursuant to *Daigle*.

In *G.N.B., Inc. v. Jones*, 29,779 (La.App. 2 Cir. 8/20/97), 699 So.2d 466, the baseline or actual AWW was increased by $35.67 for 160 hours of vacation pay valued at $1,854.40 ($1,854.40 ÷ 52 = $35.67) and was increased by $21.40 for ninety-six (96) hours of holiday pay valued at $1,112.64 ($1,112.64 ÷ 52 = $21.40). Additionally, the weekly value of insurance and other benefits, $87.28, was added to the weekly cash wage of $463.60 for a total AWW of $607.95.[2]

In *Pool*, 714 So.2d 153, an economics expert testified that the claimant's medical and retirement benefits, plus compensated time off, equaled $106.67 per week. After adjusting the actual wage to $455.67, to include overtime as shown above, the second circuit affirmed the OWC's addition of $41.38 for medical insurance, $18.60 for retirement benefit, and $46.69 for compensated time off, for a total AWW of $562.34.

In *Moses v. Grambling State University*, 33,185 (La.App. 2 Cir. 5/15/00), 762 So.2d 191, *writ denied*, 00-1769 (La. 9/22/00), 768 So.2d 1285, the court held that the claimant's AWW of $352.08 should be increased by $44.76 for weekly insurance benefits, $43.66 for weekly retirement benefits, and by $59.13, the weekly value of fourteen hours of annual leave and fourteen hours of sick leave per month, for a total AWW of $499.62.

In the present case, Monica Hornsby, employed by Lourdes for twenty-six years, and responsible for timekeeping and payroll, testified that Ms. Clay, an

---

[2]We note that in *Jones* and other cases involving injuries occurring before August 15, 1999, when subsection (f) was added to La.R.S. 23:1021(10), now appearing as 23:1021(12)(f), the courts included as fringe benefits the insurance premiums and retirement benefits that were paid by the employer. After the 1999 amendment adding subsection (f), only the employee's portion of the insurance premium is includable in the AWW as a fringe benefit, because the non-wage or fringe benefit, to be includable, must be taxable to the employee. La.R.S. 23:1021(12)(f).

hourly employee, does not get credit for time earned if she is out sick or otherwise absent. However, she earns six (6) hours of paid time off (PTO) on each of her twenty-six pay-checks, that is six hours for every eighty (80) hours worked. Ms. Hornsby also testified that each employee earns two and a half hours (2.5) of extended illness time (EIT) per pay period. This is kept in a separate "bank" and is tracked on the check stub as well.

Based upon the testimony of Ms. Hornsby, we find that Ms. Clay received an average weekly fringe benefit of PTO in the amount of $27.75 (6 x 26 = 156 hrs/per/yr ÷ 52 wks = 3 hrs/per/wk x $9.25 = $27.75). We also find that Ms. Clay received an average weekly fringe benefit of EIT in the amount of $11.56 (2.5 x 26 = 65 hrs/per/yr ÷ 52 wks = 1.25 hrs/per/wk x $9.25 = $11.56).

With regard to holiday pay under *Sterling*, *Burns*, and *Jones*, Kevin Domingue, Lourdes' director of human resources, testified that the employees receive holiday pay, and if they work on a holiday, they earn holiday overtime at the rate of one and one half times their regular hourly wage. In Ms. Clay's case, that is $13.88 per hour ($9.25 x 1.5 = $13.88). The personnel manual proffered by Lourdes indicates the provision of seven (7) paid holidays. However, if an employee is scheduled to be off on a holiday, the time is charged from the employee's PTO bank. Therefore, in this instance, regular holiday pay is already accounted for in the PTO calculation above. In the event that an employee is scheduled by Lourdes to work on a holiday, that employee is paid an additional amount for holiday overtime. Overtime is used for calculating the AWW, but only during the four full weeks preceding the injury. Therefore, while Ms. Clay earned $333.24 in holiday overtime according to her year-

15

to-date information, she did not earn it during the applicable pay periods, and we will not assign an additional amount for holiday pay in this case.[3]

In the present case, the OWC and Lourdes cited *Ivory v. Southwest Developmental Center*, 07-1201 (La.App. 3 Cir. 3/5/08), 980 So.2d 108, for the proposition that fringe benefits are not added to the actual earnings. *Ivory* is inapplicable. There, the employee was injured six months after being employed with the defendant, and the panel found that there was no evidence of fringe benefits having been received. Lourdes, with apparent approval of the OWC, interpreted this to mean that a fringe benefit, such as PTO or holiday pay, must be "used" and "received" and appear on the check stub for the four-week period prior to injury. This is not true. Ms. Clay worked for Lourdes for a total of twenty-two years. Her vacation pay and other fringe benefits would have an added value even if she had not used them in the weeks prior to her injury.

Moreover, as shown above, weeks used for vacation in the four weeks immediately preceding the injury *are specifically not used* in the calculation of the AWW because they are not *full* weeks. Likewise, there has been a tendency to misinterpret subsection (f) as requiring that a specific benefit must have been received on a check and therefore "taxed" *before* being considered in a claimant's AWW. We disagree with this interpretation, as discussed below, because subsection (f) requires benefits to be "taxable," not "taxed."

---

[3]Ms. Clay apparently worked three holidays during the year as of the pay stub dated 6/03/05 ($333.24 ÷ $13.88/hr = 24 hrs = 3 days). However, as indicated, Ms. Clay's holiday overtime pay would be calculated in the AWW as *overtime* if it had occurred during the applicable pay periods, not as a fringe benefit, because the basic holiday pay fringe benefit is characterized by Lourdes as part of the PTO benefit. It seems appropriate to here insert the observation from the above jurisprudence that fringe benefits are often averaged over a fifty-two week period and *added* to the *actual* or baseline AWW, which, including overtime, is calculated under La.R.S. 23:1021 and covers the four full weeks preceding the injury. Some parties arrive at inaccurate figures, and inaccurate reasoning, when they conclude that fringe benefits are "*included*" in the claimant's AWW and then fail to *add* the non-wage benefit to the actual wage earned.

*Ivory* held that only paid leave *used during the four weeks* preceding the accident was includable in calculating the AWW, that paid holidays were not includable for an hourly employee, that benefits were only taxable when they were used, and that fringe benefits were already included in the hourly rate. As indicated in the above jurisprudence and reasoning, these holdings are not reconcilable with the law on fringe benefits and are inapposite as precedent in calculating an hourly employee's total AWW.

In part, *Ivory* falls out of accord with established jurisprudence on holiday pay and with La.R.S. 23:1021(12)(f), due to its reliance upon *Anderson v. Eckerd Corp.*, 04-1053 (La.App 1 Cir. 5/6/05), 915 So.2d 901, *writ denied*, 05-1520 (La. 1/9/06), 918 So.2d 1044, which declined to add amounts for paid holiday and vacation benefits to a *salaried* employee's AWW. *Anderson* is too brief to shed any light on the subject, but it refers to the claimant's *salary* and cites *Moses*, 762 So.2d 191, which also addressed a *salaried* employee. The court in *Moses,* as indicated above, increased the AWW for annual and sick leave and other benefits, but not for vacation and holiday benefits.

In *Burns*, 830 So.2d at 575, we distinguished *Moses* as follows:

> In *Moses*, the employee was paid an annual salary, not an hourly wage like Mr. Burns and the employee in *G.N.B., Inc*. In the memorandum to "All Employees" regarding "Paid Time Off" and "Extended Sick Leave," Cabrini describes "Paid Leave" as "hours for use as time away from work for the purpose of vacation/holiday, personal business, family illness and/or short-term personal illness." There is no indication that without this policy hourly employees, like Mr. Burns, would be paid for holidays, unless they worked those days. According to this policy, holiday pay is the same as vacation and sick leave: employees are rewarded with these benefits for their service to the hospital. Pursuant to *Daigle*, 545 So.2d 1005, Mr. Burns' holiday pay was properly included in the AWW calculation.

17

*Ivory's* reliance on *Anderson*, and therefore *Moses*, is therefore misplaced where Ivory was also an hourly employee. Further, *Ivory* is self-conflicting because it cites our decision in *Sterling*, which held that vacation and holiday pay are taxable and includable in the AWW. According to *Ivory*, the claimant did not receive "any fringe benefits which were specifically excluded from income taxation." *Ivory*, 980 So.2d at 115. *Ivory* then fails to add them to the AWW calculation. *Ivory* then found that the claimant's sick leave, annual leave, and compensatory time were only taxable when used, which is not what La.R.S. 23:1021(12)(f) provides.

Ms. Clay earned a bonus of $384.80, which covered a full year ending with the pay period June 25, 2005, and which was reflected in a separate pay-check dated July 1, 2005. Lourdes argued at trial that this bonus should not be considered in calculating the AWW because it was not taxed to Ms. Clay until the check was cut on July 1, 2005, which was after the injury on June 28, 2005. We disagree, as stated above. The bonus was for the pay period ending June 25, just days before the injury. Therefore, it was earned prior to the injury.

Mr. Domingue testified that Ms. Clay, along with thirty-three percent of Lourdes' employees, had been at the top of her pay scale and had gone without raises for at least two years. Lourdes, therefore, paid those employees a bonus for the fiscal year ending in June 2005. The bonus was for two percent (2%) of Ms. Clay's annual earnings ($9.25 x 2080 x .02 = $384.80). Accordingly, we find that Ms. Clay's bonus should be calculated as an element of her total AWW.

The Louisiana Supreme Court in *Daigle*, 545 So.2d 1005, held that two incentive bonuses of the salaried employee would fit more neatly into the AWW if calculated as "other wages" under La.R.S. 23:1021(10)(d). The current provision is located at La.R.S. 23:1021(12)(d) and provides in pertinent part as follows:

18

(d) **Other wages**.  If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by the average number of days worked per week[.]

If we calculate Ms. Clay's bonus using subsection (d), we find that she actually worked 114 days, an average of 4.4 days per week, in the twenty-six week period preceding the injury.  Using the above formula, we arrive at a weekly benefit of $7.44 ($384.80 ÷ 2 = $192.40 ÷ 114 = $1.69 x 4.4 = $7.44).

However, the court in *Daigle* provided in a footnote that it did not use this formula in its previous decision involving an hourly employee in *Allen v. Belden Corporation*, 393 So.2d 1233 (La.1981).[4]  In *Burns*, involving an hourly employee, we included in the AWW calculation a three percent lump sum bonus of $713.24.  There, we simply divided the bonus amount by fifty-two and arrived at a weekly bonus benefit of $13.72.  Accordingly, we will use the calculation method in *Burns*, which in this case results in a weekly bonus benefit of $7.40 ($384.80 ÷ 52 = $7.40).  This brings Ms. Clay's total AWW to $416.71.[5]

---

[4]We are also aware that *Daigle* used a two-part incentive bonus paid to the claimant before his accident in May and indicated in a footnote that there was another incentive bonus paid in August, after the accident, for the first half of the year (presumably for January through June).  This third bonus was not included in the calculation of AWW, not even on a prorated basis.  Notwithstanding, we have included Ms. Clay's bonus which was earned entirely by June 25, 2005 and paid to her only days after the injury on June 28, 2005, where Ms. Clay's bonus was in lieu of an annual raise, while the *Daigle* bonuses were based upon sales volume and profit goals.

[5]We note that two of Ms. Clay's three check stubs in evidence show a deduction from her wages of $37.20 which is described simply as " health."  We are assuming that this entry constitutes a health insurance premium deducted by the employer for Ms. Clay's portion of a health insurance benefit.  Even though this deduction is not shown on Ms. Clay's check stub as a taxable amount, under La.R.S. 23:1021(12)(f), this appears to be a specifically includable benefit which would increase her AWW by another $18.60.  However, there was no testimony, argument, or additional evidence regarding this premium that would allow us to include it in Ms. Clay's AWW. Moreover, where the premium was not withheld from one of the three check stubs in evidence, with no explanation as to why, we will not include the premium in our calculation of AWW based upon insufficient information.

19

IV.

## **CONCLUSION**

Based upon the foregoing, we reverse the OWC judgment terminating Ms. Clay's benefits where she was no longer physically able to stock medical supplies and where the clerical and office positions submitted by the vocational rehabilitation counselor, and applied for by Ms. Clay without avail, were unsuitable and unavailable to her under La.R.S. 23:1221 and under *Banks*.

We further reverse the OWC's calculation of Ms. Clay's total AWW, finding that her correct AWW is $416.71, which includes an actual wage of $370.00 plus a weekly PTO benefit of $27.75, a weekly EIT benefit of $11.56, and a weekly bonus benefit of $7.40. We award an additional $5,000.00 in attorney fees for work done by Ms. Clay's attorney on appeal.

**REVERSED AND RENDERED.**